**David L. POOLE, Petitioner,**

v.

**RAILROAD RETIREMENT BOARD, Respondent.**

**No. 504, Docket 89–4069.**

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1989.

Decided June 8, 1990.

William C. Bernhardi, Buffalo, N.Y., for petitioner.

Marguerite Dadabo, Office of Gen. Counsel, RR. Retirement Bd., Chicago, Ill. (Steven A. Bartholow, Edward S. Hintzke, of counsel), for respondent.

Before OAKES, Chief Judge, PRATT, Circuit Judge, and SAND, District Judge.[1]

OAKES, Chief Judge:

This is a petition for review of a determination of the United States Railroad Retirement Board ("the Board") denying the application of a railroad car man for a total and permanent disability annuity under section 2(a)(1)(v) of the Railroad Retirement Act, 45 U.S.C. § 231a(a)(1)(v) (1982). The petitioner, David Poole, has not worked since August 31, 1986, due to an injury to his back and groin incurred from a fall from a ladder at work on August 22, 1985. The Board, in a 2–1 decision, upheld the decision of a Board referee made on August 17, 1988, after a hearing at which Poole was the only witness, denying his application for a total and permanent disability annuity. Applying to that determination the same test we use in Social Security Act cases, namely, whether the findings are supported by substantial evidence on the record as a whole, *see Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988), we reverse the Board with directions that follow.

## FACTS

Poole was born on March 15, 1952, and left high school in the eleventh grade. After brief stints unloading trucks part-time with his father and driving ambulances in the early 1970s, he worked for fifteen years with the railroad as a car inspector, work that frequently involved welding, climbing ladders, and heavy lifting of couplers weighing 150 to 200 pounds. He had

---

1. Of the Southern District of New York, sitting by designation.

injured his back several times prior to August 1985, but returned to work after each of these occasions.

On August 22, 1985, Poole was climbing a ladder at work to get out of a gondola car when apparently the feet of the ladder fell out, and he fell six to eight feet to the floor of the car. As Poole described it, he "clotheslined" himself on a rung of the ladder as he fell, catching himself in the groin and becoming entangled within the ladder when he landed. He was taken to Our Lady of Victory Hospital, where he received treatment for a contusion to the right scrotum and groin. X-rays of his right pelvis and hip showed no fracture or other abnormality. His sacroiliac and hip joints appeared normal.

At the urging of his employer, Poole returned to work the next day on "light duty," having no responsibilities other than signing in at the beginning of the day and signing out at the end. In February 1986 he resumed his usual job description, but in a very light job station given to employees who are about to retire, working only one to one-and-a-half hours a day, with minimal physical effort. By August 1986 Poole was unable to perform basic sanitary functions and required physical therapy and large doses of analgesics simply to report to work. His last day of work was August 31, 1986.

Poole's medical history following the accident reveals a long and unfortunately unsuccessful course of what Poole has estimated to be approximately two or three hundred visits to between six and eight doctors, all while his condition progressively deteriorated. Shortly after the accident, Poole saw his chiropractor, Dr. Denecke, on September 13, 1985, with a complaint of low back pain radiating to the right buttock and right leg. Although the chiropractic treatments brought temporary partial relief, Poole did not see Dr. Denecke from February 1986 until September 3, 1986, after he left work permanently. During that time his condition had so worsened that as of September 3, 1986, Dr. Denecke deemed Poole totally disabled for all work.

In the meantime, we believe in early 1986, Poole saw Dr. Perese, a neurosurgeon. Following a CT (computerized tomography) scan and complete bone scan, Dr. Perese recommended that Poole undergo spinal surgery and a myelogram. A myelogram is a process not without risk which involves the injection of a radioopaque substance into the spinal column and, as a consequence, generally is recommended solely in connection with intended surgery. Poole, fearing that his family history, obesity, and high blood pressure rendered him a high risk for surgical complications, and desiring to avoid anesthesia, declined to have Dr. Perese perform the surgery or the myelogram. He did, however, attempt to complete the noninvasive diagnostic procedure known as MRI (magnetic resonance imaging), but was unable to fit into the machine on three separate visits because of his weight.

On January 8, 1987, Dr. Denecke gave the petitioner another chiropractic treatment in connection with his left sacroiliac joint and referred him to Dr. James J. White, Jr., an orthopedic surgeon. Between the time of the referral and Dr. White's first examination, the petitioner also saw Dr. Paul Giordano, a psychiatrist on referral from an insurance company, who found Poole as of February 3, 1987, to be essentially normal with a mild level of anxiety and no depression, "with insight and judgment ... intact, but superficial." As to Poole's complaint of back pain, Dr. Giordano said, "[H]is complaints regarding back spasms appear to be valid[,] with no evidence of malingering. This does not appear to be psychogenic in origin."

Dr. White then examined Poole on February 27, 1987. As part of his examination, Dr. White read the original film of the CT lumbar spine scan done eleven months before at the behest of Dr. Perese, seeing in it the possibility of an L5, S1 mid-line disc herniation. At the examination Poole reported to Dr. White that four days after his accident he began having pain radiating to the right large toe in addition to the back pain, and that his leg pain persisted and was greater than the back pain. His pain was increased by sitting or standing for

about fifteen minutes to half an hour and by lifting and sitting. It was decreased by lying down. Dr. White found that Poole had a normal heel-toe gait, but suffered from weakness in the right calf on repetitive tiptoeing and weakness in the right leg without reflex abnormality or sensory loss. The straight-leg raising test was positive on the right at sixty degrees. Dr. White's diagnosis was radiculopathy (nerve root disease) in the right L5 nerve root, suggesting L4–5 disc herniation. He believed that there had been no improvement since Poole had first injured himself and that there would be none without surgery.

Dr. White examined Poole again on April 3, 1987, at which time, according to the doctor's letter report of April 5, Poole's leg pain continued to be worse than the back pain. Poole's forward spinal flexion was limited to seventy degrees, and his straight-leg raising was positive at sixty degrees in the right with pain radiating to the right big toe. Dr. White again found right leg weakness without reflex abnormalities. The doctor confirmed his impression of right L5 radiculopathy and said that

> I don't feel that further conservative care is going to be of any benefit. I have told the patient this in the past. He would not like anything done of a surgical nature and for this reason I don't think there is any reason for me to continue to see him.

According to Poole, however, Dr. White's April 5 letter is an incomplete account of the consultation. Poole contends that Dr. White, notwithstanding his "on-the-record" remarks recommending surgery, informed Poole "off the record" that he should avoid surgery as long as possible.

Three weeks later, on April 24, 1987, Poole filed the application under review here, stating in the medical summary form that he could not work because he could not bend, climb, sit, or stand for very long, could not do any lifting or reaching, and, because of high blood pressure, could not strain himself. Poole attested to very frequent muscle spasms in his back radiating to his lungs and pain radiating from his back to his feet. He said that as of Sep-

tember 1986, Dr. Denecke and Dr. Perese would not allow him to work, and that he was taking prescription medication for pain. He described his daily activities as being limited. He could walk only 500 feet due to pain. He had to shower because he was unable to sit in the bathtub. He had difficulty dressing and on some days needed help from his wife in tying his shoes. He could drive only short distances and had no access to public transportation. Mostly, he sat around the house reading the newspaper or watching television and trying to take short walks. He had had to give up his hobbies of photography and doing improvements to his house.

Following a meeting with Poole, the Railroad Retirement Board claims representative reported that Poole had difficulty remaining seated or standing in any one position for longer than ten to fifteen minutes due to pain and that Poole got off his chair only with great effort, using both hands on a desk, grimacing while walking slowly and carefully, and wobbling as he walked. To the claims representative, Poole seemed depressed upon explaining his transformation from having led a very active life to virtual inactivity.

On May 12, 1987, Dr. Denecke, the chiropractor, examined Poole again and sent a report to the Board. Dr. Denecke noted Poole's complaints of steady pain in his lower right hip with several periods of pain radiating into the left leg, difficulty getting out of bed due to pain, and difficulty walking at times. Dr. Denecke reported total fixation of the right sacroiliac joint, as well as sciatic parasthesia (insensitivity to pain) of the right leg, slight weakness of the right extensor halicus longus muscle (the muscle which extends or straightens the great toe and flexes the ankle joint and which is activated by the anterior tibial nerve), and positive straight-leg raising on the right at about sixty degrees. Based upon a diagnosis of chronic severe lumbar sacro strain/sprain, associated sciatic parasthesia of the right leg and underlying sacroiliac fixation subluxation, Dr. Denecke's prognosis was that Poole was permanently and totally disabled. Because of the length of time the problems had per-

sisted and the history of previous back problems for which he had treated Poole, Dr. Denecke offered Poole little hope for recovery.

In a letter dated June 6, 1987, addressed to Railroad Employees Mutual Association, Dr. White referred to his previous report of April 5, saying that he had said in the report that Poole "did not feel the symptoms were bad enough to warrant surgery." However, this was not an entirely correct characterization of what Dr. White's April 5 letter had reported. According to the April 5 letter, Poole did not say that the symptoms were bearable, but rather that "[h]e would not like anything done of a surgical nature." Nevertheless, Dr. White further stated in his June 6 letter that

> based on my findings on physical examination at that time I would believe that this gentleman would be capable of light duty or ideally sedentary type of employment. I believe that he should not be required to lift objects weighing more than about 10 lbs. and under no circumstance should he be bending and squatting in order to lift objects.

He added subsequently in the June 6 letter that "if he did have an occupation which required sitting or standing he should be allowed to change his position frequently during the day."

On November 9, 1987, Poole had a cardiovascular examination at the request of the Board by Dr. Kenneth L. Gayles. Dr. Gayles reported on November 23, 1987, that Poole was 5 feet 10 inches, weighed 282 pounds, and had a blood pressure reading of 160/110. Dr. Gayles described his examination as showing "lumbosacrum tender paravertebral muscles, no spasms," and decreased range of motion with a trace of edema on the lower extremity bilaterally. According to the report, straight-leg raising was limited to thirty degrees on the left and to sixty degrees on the right, due to back pain. Dr. Gayles, however, did find pinprick light touch and pressure sensation intact with full reflexes, although Poole's gait did favor the right leg. Poole's EKG was normal. Dr. Gayles' "impressions" in-

cluded "R/O herniated disc with associated sciatica," hypertension, esophagitis, and obesity, with no opinion rendered on Poole's physical capacity or ability to do work. Poole reported that the Gayles examination was very hastily performed and filed an affidavit on June 28, 1988, stating that his physical examination in Dr. Gayles' office was performed not by Dr. Gayles but by someone who identified himself as "work[ing] with Dr. Gayles" and who may or may not have been a certified specialist. Dr. Gayles was not called to refute this statement.

In a letter dated February 17, 1988, the Bureau of Retirement Claims notified Poole that his claim for a disability annuity was denied, the decision somehow concluding that he "should be able to lift or carry a maximum of fifty pounds, twenty-five pounds frequently; stand, walk, or sit about six hours per eight hour day; climb stairs or ladders frequently; and bend, stoop, kneel, crouch, or crawl frequently." How this conclusion was arrived at, we do not know, except that there is in the administrative record a cursory "disability decision sheet" of February 3, 1988, signed by one C. Lofton, referring to Poole's "low back syndrome," but not outlining any reasons for considering Poole not disabled. Who Lofton is or what Lofton looked at do not appear on the sheet or anywhere in the record. Poole's February 22, 1988, request for reconsideration was denied in a letter dated March 14, 1988, following review of both Dr. White's letter of June 6, 1987, and transcripts of eyewitness accounts of the injury. The letter denying reconsideration concluded that Poole was capable of doing medium work.

In March 1988 Poole began seeing Dr. Gabino Baloy, an internist, who examined Poole both on March 4 and March 9, 1988. Dr. Baloy's letter of March 10 stated that Poole was "under my care for severe back pain and difficulty with walking." Dr. Baloy reported "total agreement" with Dr. White that Poole was suffering from L4–5 disc herniation, and prescribed Roboxin analgesics and bed rest for Poole. Dr. Baloy further stated that "at this time the patient is totally disabled" and that he had advised

Poole to have MRI studies and a myelogram. This letter was not provided to the Bureau of Retirement Claims, however, in time for it to be weighed in the decision on reconsideration.

On March 21, 1988, Poole filed an appeal with the Board's Bureau of Hearings and Appeals. In connection with the appeal, the Board considered Dr. Giordano's and Dr. Baloy's reports and received a letter dated June 29, 1988, from Dr. White which stated that his initial report to Consolidated Rail Co. dated March 1, 1987, had indicated that Poole might have a disc herniation at L5, S1. Dr. White moreover wrote in his June 1988 letter that it was immaterial that the CT scan had been normal, because the CT scan has a high incidence of false negative reports in identifying disc herniations for individuals who have otherwise objective evidence of disc herniation. He added rather gratuitously that "[t]his gentleman from my point of view, who has been out of work for several years, has only been seen by me on three separate occasions, and that would indicate that he does not have the greatest degree of motivation." Obviously, Dr. White must not have been aware of the other specialists Poole had consulted. Additionally, Dr. White must have overlooked that it was his idea, as expressed in his April 5, 1987, report, that Poole no longer bother seeing him.

On August 17, 1988, a hearing on Poole's appeal was held in Buffalo, New York, before a referee. After the hearing Poole was examined by Dr. Ismet Hallac, a neurosurgeon, at the request of the appeals referee. Dr. Hallac evidently took a medical history but his report does not mention that he reviewed medical records other than Dr. White's reports to Dr. Denecke. Dr. Hallac noted that Poole walked with a limp favoring the right leg, that he weighed 285 pounds, that his knee reflexes were normal, and that his ankle reflexes were present but depressed—the sensory examination being inconclusive. He found no wasting or measurable atrophy of the legs and straight-leg raising at fifteen degrees on the left and fifty degrees on the right. He found Poole to have tight bilateral lumbar paravertebral muscles and "questionable" weakness in the right toe dorsiflexion. His impression was that Poole had "possible signs of lumbar disc herniation" but that his major problem was one of obesity. He indicated that Poole should not work at high altitudes, that prolonged standing was not advisable, and that Poole should not carry more than thirty pounds or use his back excessively.

On August 23, 1988, Poole was examined by Dr. Stephen D. Rycyna, Jr., an orthopedic surgeon, also at the request of the appeals referee. In his report dated September 12, 1988, Dr. Rycyna stated that Poole was "extremely obese" and that, as he sat in the doctor's office, Poole suffered "mild to moderate lower back and right extremity pain." Dr. Rycyna also found measurements of the quadriceps and calves to be alike on both legs and deep tendon reflexes to be symmetrical and equal. He also found Poole's big toe dorsiflexor on the right weakened to about 50% of the strength of that on the left. He also found marked diminution to pinprick in the first web space of the right foot, straight-leg raising active on the left forty-five degrees and on the right thirty degrees, zero to sixty degrees of forward flexion in the back, fifteen degrees lateral movement to the left and twenty degrees to the right, and a guarded heel-toe gait. It was his impression "based on the clinical symptomatology and history" that Poole "presents with a herniated disc at the L4–5 level," sharing the same conclusion of Dr. White and Dr. Baloy. Dr. Rycyna reported to the Board that "[h]e is totally disabled from his employment at this time and will probably require surgical intervention in the future."

Dr. Denecke reported in a letter dated September 12, 1988, that he had reexamined Poole on August 15, 1988. At that time, Poole weighed 264 pounds, with his gross range of motion in flexion and extension reduced and limited by pain in all directions. More particularly, Dr. Denecke found bilateral fixation or hypomobility following motion palpation of the "S.I." (presumably the sacroiliac), a Bechterews sitting test positive on the right side, straight-leg raising to fifteen degrees on the right

side and thirty degrees on the left, and normal reflexes. Poole had a ⅜" difference midcalf between his right calf and his left. Dr. Denecke also found pain on resisted right hip flexion and extension and pain on passive medial and lateral rotation. His diagnosis was "severe chronic lumbarsacral strain/sprain with L4–5 disc involvement" and "attending rt [right] leg sciatica, underlying fixation subluxation."

The night before his hearing, Poole was kept up until 2:00 a.m. by pain. He brought a cane to the Board's office but left it outside in the waiting room. When asked about the cane, Poole said that he uses it sometimes, but that he does not require it to walk around the house because he holds onto the furniture. Twice during the hearing Poole stood up while giving testimony. The first time the referee remarked on his own that Poole was uncomfortable in his chair, and the second time Poole noted that sitting for any length of time bothers him, "like two nerves touching." He described the pain he suffers, which starts in the base of his spine and goes through his right hip and down his leg to his big toe, "like a dentist hitting a tooth with a drill, except it's going on in your leg." He stated that even though he has taken Tylenol Codeine No. 3 and Roboxin for his pain, these make him groggy but often are not sufficient to allow him to sleep at night. He naps frequently and does not stay alone with his three children for fear that he will fall asleep while watching them. He described his current lifestyle as "probably ... below the quality of a lifestyle of a person in a nursing home," stating that he can barely bend at all without pain and that his wife must tie his shoes. Because of the pain he cannot lose weight by exercising. He comes downstairs once in the morning and goes upstairs once at night. His brother and sister-in-law, who live three doors away, drive him everywhere he has to go, Poole having driven only about fifty miles himself in the past year. To watch television he must change positions frequently. He reads the Bible but is unable to attend church events. He has a small personal computer which he uses to access data

bases on a program his brother installed for him. He testified that his standing is limited to fifteen or twenty minutes at a time. He cannot sit for over a half hour without pain. Poole stated that a month before the hearing he was forced to sit for two hours and was in severe pain for three days afterward, with his leg going completely dead for an hour and a half. He said he cannot bend, stoop, crawl, or reach, and needs help in and out of a chair. He has had to purchase a special elevating bed, and at the time of the hearing he and his wife were shopping for a chair with an elevator lift to help him get to his feet. If he walks for two city blocks, his right leg feels as if he has been "lifting weights with it for a hundred years." Poole stated that on two recent occasions his leg had gone totally dead as if shot with Novocaine, with numbness setting into his groin and testicles. The heaviest thing he can lift is a cup of coffee or a glass of water; he cannot lift a bottle of milk.

Poole also says that he looked for work, based on Dr. White's opinion a year before the hearing, but that his physical condition impeded his efforts. He was unable to do the bending required for counter work at a dry cleaner's, and an insurance company would not hire him to do filing. Employers refused his offers to work off the books.

On December 8, 1988, the appeals referee issued a decision affirming the denial of Poole's claim for a disability annuity. Although the referee found that Poole could no longer perform his past work as a railroad car man or car inspector and recognized that the burden had shifted to the Board to establish that there was other work that Poole could perform, the referee found that Poole had a residual functional capacity for sedentary work. Considering Poole's residual functional capacity, his age, his education, and his past work experience, the referee deemed that Poole could be expected to make a vocational adjustment under one of the so-called grid rules, specifically Medical Vocational Guideline 201.25 contained in 20 C.F.R. § 404, subpt. P, app. 2 (1989). That guideline provides that an individual between the ages of

eighteen and forty-four with a "limited or less" education, whose previous work was skilled or semi-skilled but who has no transferable skills, and yet has residual functional capacity limited to sedentary work, is not disabled.

## DISCUSSION

■ Section 8 of the Railroad Retirement Act of 1974, 45 U.S.C. § 231g (1982), incorporates the judicial review provisions of section 5(f) of the Railroad Unemployment Insurance Act, 45 U.S.C. § 355(f) (1982), an act also administered by the Board. Section 5(f)· provides that "[t]he findings of the Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive."

As a guide for the proper scope of our review of the Board's factual findings, we borrow from disability cases arising under the more frequently litigated Social Security Act, 42 U.S.C. § 401 *et seq.* (1982 & Supp. V 1987). Because the Railroad Retirement Act and the Social Security Act share similar definitions of disability, *compare* 45 U.S.C. § 231a(a)(1)(v) (1982) *with* 42 U.S.C. § 423(d)(1)(A) (1982), it is a well-accepted practice to use case law construing disability under the Social Security Act as precedent for cases coming under the Railroad Retirement Act. *See, e.g., Estes v. Railroad Retirement Bd.*, 776 F.2d 1436, 1438 (9th Cir.1985); *Peppers v. Railroad Retirement Bd.*, 728 F.2d 404, 406 (7th Cir.1984) (per curiam).

Similarly, we review administrative factual findings made under each statute with the same purpose in mind. As we observed in *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988), "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary ...." Thus we look to whether the Board's determination is supported by substantial evidence on the record as a whole, as we would scrutinize a disability determination made by the Secretary of Health and Human Services under the Social Se-

curity Act, *see id.*, and as the Third Circuit already does in Railroad Retirement Act cases. *See Kelly v. Railroad Retirement Bd.*, 625 F.2d 486, 493 (3d Cir.1980) (citing *Stephens v. Railroad Retirement Bd.*, 301 F.2d 899, 900–01 (7th Cir.1962)).

Under this test we consider the weight of the evidence relied on by the referee and balance that evidence against contradictory evidence indicating that Poole suffers from a disabling condition. *See Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir.1989) (citing *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987)). If the record so considered as a whole supports the administrative finding, we must accept that finding regardless what our view of the factual situation might be on an independent appraisal of the evidence. *See Whiten v. Finch*, 437 F.2d 73, 74 (4th Cir.1971). But it is precisely because we must weigh the evidence in this case that we have set it out in such detail.

■ Our review of the Board's determination borrows from Social Security precedent in one other important respect. Under what is commonly known as the "treating physician rule," a treating physician's opinions on the subject of disability is "(1) binding on the factfinder unless contradicted by substantial evidence and (2) entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir.1988). This rule makes for fairness to claimants by giving due weight to the best evidence of their condition, namely, from the experts who know them best. Because·the same concern motivating resort to the treating physician rule in the Social Security context—i.e., ensuring fairness to claimants by giving due weight to the evaluations of those experts who know best the claimant's condition—is equally present in a Railroad Retirement case, we follow the treating physician's rule in reviewing the Board's determination.

The parties dispute several points relating to the treating physician rule's applica-

tion in this case. First, the Board claims that none of the specialists who saw Poole may be considered treating physicians because none established a sufficiently ongoing physician-patient relationship with Poole to have his views accorded the special deference mandated by the treating physician rule. *See id.* at 45–46 (noting that the existence of "an ongoing treatment and physician-patient relationship with the claimant" is a predicate for application of the treating physician rule).

Second, there also exists some question whether Poole's chiropractor, Dr. Denecke, may be considered a "treating physician" for the purpose of evaluating the referee's findings. We have not yet had occasion to address this issue. Several cases have followed the Secretary's definition of an "acceptable medical source" as limited to licensed physicians, osteopaths, psychologists, and optometrists, *see* 20 C.F.R. § 404.1513 (1989), and have refused to consider chiropractors as treating physicians. *See George v. Bowen,* 692 F.Supp. 215, 219 (S.D.N.Y.1988); *Vasquez v. Secretary of Health and Human Servs.,* 632 F.Supp. 1560, 1565 (S.D.N.Y.1986). A third case has reached the contrary conclusion and found that chiropractors should be deemed treating physicians in appropriate circumstances. *See Santiago v. Bowen,* 715 F.Supp. 614, 615–16 (S.D.N.Y.1989).

■ We find it unnecessary to resolve at this time either question relating to the application of the treating physician rule. As pertains to the opinions of the various specialists who have seen Poole since his accident, as we discuss below, all of these specialists have reached substantially the same conclusion that Poole is in fact disabled. Regardless whether the treating physician rule would attach to any of these opinions, it suffices to note that the rule requiring substantial evidence on the record as a whole to support a Board determination counsels that the Board swims upstream in defending a determination contrary to a substantial medical consensus. Turning to Dr. Denecke, even assuming, without deciding, that Dr. Denecke's views do not carry the weight accorded to a treat-

ing physician, at the very least, in light of the education, licensing, and supervision requirements to which chiropractors are subject in New York State, *see* N.Y. Educ.Law § 6554 (McKinney 1985), and the significant role Dr. Denecke has played in Poole's treatment, his opinion that Poole is totally disabled does merit significant weight. *See Santiago,* 715 F.Supp. at 615–16; *cf.* 20 C.F.R. § 404.1513(e)(3) (1989) (acknowledging that a chiropractor's opinion may prove helpful in some circumstances); *Vasquez,* 632 F.Supp. at 1565 (same).

Applying the substantial evidence standard to the referee's findings (to which we must look since the 2–1 majority of the Appeals Board wrote no opinion), we find that they come up short. Without parsing every finding that the referee made, we find that the referee unquestionably erred with respect to several critical findings. First, he discounted Poole's condition, characterizing it as "a questionable herniated disc," when the evidence, viewed as a whole, makes clear that Poole does have a herniated disc that is not in the least questionable. Dr. White, the orthopedic surgeon, Dr. Baloy, the internist, and Dr. Rycyna, the Board's consulting orthopedic surgeon, all noted both Poole's subjective symptoms of pain from his lower back and right extremity extending down into his toe, and his objective symptoms of diminution to pinprick on the right extremity and of reduced straight-leg raising on the right side with restricted degrees of lateral and other back movements. These and other objective symptoms led Dr. White to conclude that there was radiculopathy, or nerve root disease, in the right L5 nerve root, suggesting L4–5 disc herniation. Dr. Baloy agreed completely with Dr. White that Poole was suffering from L4–5 disc herniation, and Dr. Rycyna came to the same conclusion based on the clinical symptomatology and history. Dr. Denecke, the chiropractor who originally referred Poole to Dr. White and who probably saw Poole more over the several years since his accident than any of the other doctors who examined him, similarly concluded that Poole suffered from a herniated disc.

The evidence relied on by the referee in finding only a "questionable herniated disc" is of little value. For instance, although the referee observed that the CT lumbar scan done in March 1986 in Mercy Hospital was "normal," Dr. White viewed the same CT lumbar spine scan on February 27, 1987, and saw in it the possibility of an L5, S1 disc herniation. Moreover, to the extent that the CT scan could have been read to preclude a disc herniation, Dr. White later wrote to the Board on June 29, 1988, that CT scans give notoriously false negatives of disc involvement.

Additionally, the referee relied on neurological and orthopedic evaluations by Drs. Hallac and Rycyna finding normal reflexes and no evidence of atrophy of Poole's lower extermities. Poole reported, however, that the neurological examination by Dr. Hallac was done very hastily and that the doctor had Poole's right and left legs mixed up, perhaps because he was facing Poole when he did the straight-leg raising test. Even so, Dr. Hallac still had an impression of "possible signs of lumbar disc herniation." Moreover, although atrophy frequently accompanies disc herniation, there is nothing in the record to indicate that it always does. In fact, Dr. Rycyna found a disc herniation, and Dr. Hallac found "possible signs" of one.

Perhaps because the referee made the first mistake, thinking that the herniated disc was only "questionable," he made a second key error by unreasonably discounting the extent of Poole's resulting disability and finding only that Poole "does have some back pain." In fact, the overwhelming evidence in the record as a whole, not just from Poole's testimony, is that Poole has considerable and oftentimes exquisite back as well as leg pain, causing him to be unable to sit or stand for more than a few minutes at a time; to need analgesics and bed rest; to have trouble bending, dressing himself, or tying his shoes; and to be unable to stoop, drive, or walk more than a limited distance without pain. This pain was noticed by one doctor after another, and even by the claims representative who observed Poole soon after he filed his claim. Indeed, Dr. Giordano, the psychia-trist consulted by the insurance company, affirmed that the pain was real and that Poole was not malingering. As Poole described it, his lifestyle is much like that of a person in a nursing home. He sits around the house, reading the newspaper, watching television, and trying to take short walks. He has given up his hobby of photography because he cannot carry around the equipment, and his hobby of working on his house, which he used to do quite a bit.

In underestimating the degree of Poole's disability, the referee relied on and, we think, was to a certain extent misled by, Dr. White's statements in his letters of March 1 and April 5, 1987, to Dr. Denecke and of June 6, 1987, to the Railroad Employees Mutual Association. The substance of Dr. White's letters to Dr. Denecke was that, in Dr. White's opinion, surgery was the only possible avenue for improvement and that Poole would not accede to surgery. Alone these letters might suggest that Poole's disability was solely a product of his own unjustified intransigence. However, as Poole has testified, his family and medical histories provide good cause to shy away from surgery. Neither Dr. White's reports nor the referee's findings make mention of this consideration. Indeed, as mentioned above, according to Poole, Dr. White acknowledged off the record that Poole probably should avoid surgery. The referee did not attempt to resolve this discrepancy.

Dr. White's June 6 letter also fosters the same unwarranted impression of the disability as being Poole's own doing. In particular, Dr. White's June 6 letter represents that he had indicated in his April 5 report that Poole "did not feel the symptoms were bad enough to warrant surgery." The April 5 report simply does not say this. Rather, the April 5 letter said, "He would not like anything done of a surgical nature," which is consistent with Poole's reluctance to have surgery because of its risks, not because of his unwillingness to take reasonable steps to bring himself back to health. In this regard, we take judicial notice that the particular steps Poole would

have had to have taken, a myelogram and a laminectomy, both are serious procedures.

Although Dr. White's June 6 letter offers the opinion that Poole should be able to do sedentary work, this opinion is prefaced with the reservation that such work should not "require him to lift objects weighing more than about ten pounds or require bending or squatting in order to lift objects" and should permit him "to change his position frequently during the day." The referee's findings do not mention Dr. White's qualification that Poole must be allowed to change positions frequently.

We believe the referee additionally was misled by Dr. White's somewhat flip comment in his June 29, 1988, letter that Poole's visiting him only three times over the course of a year indicated a lack of motivation on Poole's part. On the contrary, Poole testified to having made between 200 and 300 visits to medical specialists since his injury. Moreover, as noted above, Poole's discontinuing his visits to Dr. White was Dr. White's idea in the first place, and not Poole's.

Although the referee did not find Poole's testimony credible that the pain is so severe or so constant as to preclude his ability to do any work-related activities, we cannot help but believe that this finding was based upon the mistaken findings mentioned above.

Other significant findings made by the referee regarding the extent of Poole's disability were similarly flawed. The referee found that Poole could perform his own self-maintenance, even though Poole can go up or down the stairs only once a day, cannot sit in a bathtub, and needs help from time to time tying his shoes or putting on his pants. The referee also asserted that Poole's abilities to focus upon questions at the hearing, to do Bible study at home, and to use his personal computer at home prove that Poole has residual functional capacity enabling him to do sedentary work. We do not see how the latter necessarily follows from the former. The fact that Poole is mentally alert and does Bible study in his home or can use his personal computer at home does not mean

that he can do sedentary work, especially in light of all of the other evidence in the record depicting the debilitating and all-consuming nature of Poole's disability.

Because we believe the finding that Poole is totally disabled is compelled on the record read as a whole, the arguments relating to his ability to do other work, which assume that he is not totally disabled, are not relevant. It is difficult for us to visualize the kind of job that a person in considerable pain could do when he is unable to sit or stand for more than a few minutes at a time and must have a certain degree of bed rest and take pain-relieving medication, at least where he is unable to bend or squat or lift objects weighing as much as a bottle of milk. Poole need not be a complete invalid to be entitled to benefits. *See De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 935 (2d Cir. 1984). Rather, he need only be totally and permanently disabled. We think the substantial evidence in the record as a whole supports such a determination.

■ The final question we face is whether a person who is totally and permanently disabled but can potentially improve his condition with surgery is required to go the surgical route in order to get benefits. We do not think he is. Poole has ample reason not to go through surgery, if that is the only way to treat his herniated disc. Whether or not it is the only possible treatment, and there is some reason to think that it might not be given the state of medical advances in this day and age, we reverse and direct that Poole be awarded the annuity which he seeks.

Petition to review granted; order as above set forth.