**John J. HARTNETT, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 98–CV–0656(JG).**

United States District Court, E.D. New York.

Oct. 23, 1998.

Stanley F. Meltzer, Meltzer, Fishman, Madigan & Campbell, New York City, for Plaintiff.

Zachary W. Carter, United States Attorney, Brooklyn, NY, by Steven J. Riegel, Assistant United States Attorney.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Plaintiff John J. Hartnett brings this action pursuant to 42 U.S.C. § 405(g) to review a final determination of the Commissioner of the Social Security Administration ("the Commissioner"), denying him disability insurance benefits under the Social Security Act. The defendant has moved for a remand, acknowledging that the Administrative Law Judge may have improperly rejected the opinion of plaintiff's treating physician. Plaintiff has moved pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings directing an award of benefits. In the alternative, plaintiff requests that the matter be assigned to a different Administrative Law Judge on remand.

Oral argument was held on October 23, 1998. For the reasons set forth below, the case is remanded and shall be transferred by the Commissioner to another Administrative Law Judge.

### FACTS

John Hartnett is a forty-six year old male who has completed two years of college. (Tr. 48, 79.)[1] For over twenty years prior to his retirement, Hartnett was employed as an officer of the New York City Police Department, where he reached the rank of Detective Sergeant in the Manhattan robbery squad. (Tr. 39–40, 79.)

While on duty on March 18, 1993, Hartnett slipped on ice and landed on his back. (Tr. 41, 90.) Hartnett was evaluated at the Beth Israel Medical Center on the same day. (Tr. 145–49.) He was prescribed a pain killer to be taken as needed, and was told to arrange a follow up appointment with a private physician. (Tr. 145–47, 149.)

On April 14, 1993, Hartnett met with and was examined by an orthopedist named Dr. Francis J. Lanzone. (Tr. 149.) Dr. Lanzone's examination revealed that Hartnett suffered a lower back disorder and experienced severe pain that traveled from his lower back down both legs. (Tr. 149.) After taking X-rays of Hartnett's back, Dr. Lanzone determined that Hartnett had Grade II spondylolisthesis,[2] and that this condition appeared to be traumatic. (Tr. 149.) A subsequent magnetic resonance imaging ("MRI") scan confirmed the occurrence of spondylolisthesis, as well as the existence of two herniated discs, one of which may have impinged upon nerve roots. (Tr. 149, 151.)

Upon the recommendation of Dr. Lanzone, Hartnett obtained a neurosurgical evaluation from Dr. Paul R. Cooper of the New York University Medical Center on June 3, 1993. (Tr. 149.) After examining Hartnett and reviewing his MRI scan, Dr. Cooper recommended that Hartnett undergo surgery in which he would receive a lumbar laminectomy[3] and an L5–S1 fusion.[4] (Tr. 153.) However, Hartnett expressed to Dr. Lanzone his fears of undergoing surgery, and elected to undertake physical therapy instead. (Tr. 149 .) Dr. Lanzone noted that Hartnett was not improving during physical therapy, and recommended that Hartnett undergo the operation because he would likely deteriorate otherwise. (Tr. 150.) Hartnett still declined surgery. (Tr. 150.)

In July of 1993, Hartnett returned to work for the police department in a limited capacity, taking on a desk job in which he primarily filled out paper work. (Tr. 45, 75.) During this period of time, Hartnett frequently attended physical therapy and missed days of work. (Tr. 45, 75.) On May 27, 1994, Hartnett retired from the police department. (Tr. 35, 45, 48, 79.)

---

1. The abbreviation "Tr." refers to the certified transcript of the entire record of proceedings relating to this case.

2. Spondylolisthesis is defined as the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." PDR Medical Dictionary 1656 (1st ed.1995).

3. A laminectomy is defined as "[a] surgical operation in which the posterior arch of a vertebra is removed." 3 Attorney's Dictionary of Medicine L–24 (1998).

4. An L5–S1 fusion refers to the union of the fifth lumbar vertebra and the first sacral vertebra. PDR Medical Dictionary 93, 696; 5 Attorney's Dictionary of Medicine S–264.

Hartnett filed an application for disability insurance benefits on March 29, 1995. (Tr. 16, 48.) The Social Security Administration ("SSA") denied the application on August 4, 1995, and after Hartnett requested reconsideration, the claim was again denied. (Tr. 60–66.) Following these denials, Hartnett requested a hearing. (Tr. 67–69.) On July 30, 1996, a hearing was held before Administrative Law Judge Jonathan Jacobs (the "ALJ").

In a decision issued on August 27, 1996, the ALJ determined that Hartnett had not engaged in any substantial activity since his medical condition caused him to stop working, that Hartnett suffered from a severe impairment, and that there was no indication that Hartnett's impairment equaled the severity of any disabling condition listed in Appendix 1 of the regulations. (Tr. 17.) The ALJ next found that Hartnett's statements regarding his impairment were "not entirely credible," and concluded that Hartnett "overstates the difficulties posed by his back impairment." (Tr. 18.) The ALJ also rejected the opinion of Dr. Lanzone, Hartnett's treating physician, who had stated in reports dated May 31, 1995 and July 5, 1996 that Hartnett was "totally disabled from any gainful employment." (Tr. 163; *see also* Tr. 171.) In justifying his rejection of Dr. Lanzone's opinions, the ALJ explained that Dr. Lanzone's conclusion of total disability was "not consistent with his earlier statements or with the record as a whole." (Tr. 19.)

The ALJ then turned to the issue of whether Hartnett possessed the residual functional capacity to perform other work. Based on Hartnett's own statements in the record and the results of a consultative examination undertaken by Dr. C. Sharma, a neurologist, the ALJ found that Hartnett could perform sedentary work activity. (Tr. 20–21.) Applying the Medical–Vocation Guidelines of Appendix 2 of the regulations, the ALJ concluded that Hartnett is not disabled. (Tr. 21.)

On December 4, 1997, the Appeals Council denied Hartnett's request for review of the ALJ's decision. This action followed.

## DISCUSSION

### A. Disability Determinations and the Standard of Review

In evaluating Hartnett's claim of disability, the ALJ was required to follow a five-step process:

"First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one."

*DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)).

In reviewing the Commissioner's decision, I must decide whether his conclusions are supported by substantial evidence in the record and whether they were reached by the application of the proper legal standard. *See Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pe-*

*rales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Where substantial evidence supports the ALJ's conclusions, this Court will not substitute its own judgment as to the facts. *See Brown v. Bowen,* 905 F.2d 632 (2d Cir.1990), *cert. denied,* 498 U.S. 1093, 111 S.Ct. 979, 112 L.Ed.2d 1064 (1991).

## B. *The Opinions of Treating Physicians*

In 1991, the SSA promulgated new regulations for weighing the opinions of treating physicians in disability cases. *See Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998). Under these regulations, a treating physician's opinion will be given controlling weight if the SSA finds that such opinion "is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a case record. 20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight under the 1991 regulations, the SSA must assess the following factors in determining how much weight to afford that opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Schaal,* 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Moreover, if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly. *Clark v. Commissioner of Social Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal,* 134 F.3d at 505; *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996).

In this case, the parties do not dispute that the ALJ's rejection of Dr. Lanzone's opinion did not comport with the standards set forth above, thereby meriting at least a remand. (Pl. Br. at 11; Def. Br. at 3.) The remaining issues are whether the record supports an award of benefits rather than a remand, and whether the case, if remanded, should be assigned to a different ALJ.

## C. *Remand or Award of Benefits*

"[W]hen the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," it is appropriate for a court to reverse an ALJ's decision and order the payment of benefits. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). By contrast, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," a case should be remanded to the Commissioner for the further development of the evidence. *Id.*

In support of his motion for reversal and an award of benefits, Hartnett argues that the record is essentially complete, that the defendant has failed to point out what additional material could be obtained to help in the evaluation of the evidence, that there were no inconsistencies in Dr. Lanzone's reports, that the passage of time militates against a remand, and that a reversal by this Court may cause the Commissioner to "direct[ ] the various components of the Administration to recognize the need for due process." (Pl. Br. at 10.)

Although the issue is a close one, I do not agree with Hartnett's claim that the record on remand will be devoid of evidence sufficient to establish that Hartnett has the residual functional capacity to perform sedentary work. Dr. Anthony L. Danza has submitted a Residual Physical Function Capacity Assessment in which he opines that plaintiff can occasionally lift or carry twenty pounds, can frequently lift or carry ten pounds, and can sit, stand and/or walk for about six hours during an eight-hour workday.[5] (Tr. 53.) The record also contains the report of Dr. Sharma, who found no signs of disk herniation and stated that Hartnett's

---

5. Dr. Danza's report distinguishes this case from *Balsamo v. Chater,* 142 F.3d 75 (2d Cir.1998), upon which Hartnett relies. In *Balsamo,* the Second Circuit remanded with a direction to award benefits because none of the medical opinions supported the residual factual capacity finding of the ALJ (who was ALJ Jacobs). *Id.* at 77–79.

neurological examination was normal.[6] (Tr. 170.) These reports appear to conflict with the findings of Dr. Lanzone, and as the Second Circuit has held, "[i]t is for the SSA, and not [a] court, to weigh the conflicting evidence in the record." *Schaal*, 134 F.3d at 504; *see also Valente v. Secretary of Health and Human Servs.*, 733 F.2d 1037, 1042 (2d Cir.1984) (district court may not make its own findings of fact). In addition, I am unable to say that, after the record has been clarified upon remand and an ALJ applies the proper legal standards to Dr. Lanzone's opinions, an ALJ's consideration of the evidence will remain unchanged. *See Schaal*, 134 F.3d at 504. Indeed, upon remand and further review, an ALJ may determine that Dr. Lanzone's opinions should be given controlling weight. I thus deny plaintiff's request for reversal and an award of benefits.

### D. *Remand to a Different ALJ*

As a general matter, courts have held that whether a case is remanded to a different ALJ is a decision for the Commissioner to make. *See Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir.1993). In certain circumstances, however, courts have not hesitated to order the Commissioner to transfer a case to a different ALJ on remand. *See, e.g., Ventura v. Shalala*, 55 F.3d 900, 903 (3d Cir.1995) (ALJ "coercive and intimidating" toward claimant); *Ortiz v. Chater*, No. 95 CV 3126, 1997 WL 50217, at *3 n. 1 (E.D.N.Y. Jan.30, 1997) (rather than have same ALJ review case for third time, "fresh look by another ALJ would be beneficial"); *Kendrick v. Sullivan*, 784 F.Supp. 94, 103 (S.D.N.Y.1992) (ALJ had been "frequently criticized by reviewing courts for insensitive behavior towards disability claimants").

█ In requesting that this Court order the Commissioner to appoint another ALJ upon remand, plaintiff relies upon an issue that arose both during the hearing of July 30, 1996 and in the ALJ's written opinion. Specifically, during the hearing the ALJ challenged Hartnett's decision not to undergo surgery:

Q: Okay, okay. Now one more thing. At some point you were, it was suggested that you have surgery for your condition, is that right?

A: Yes, sir.

Q: And you refused.

A: Yes, sir.

Q: Well, is your pain very, very severe?

A: It is severe but I don't want—

Q: Why would you refuse surgery? That doesn't make sense.

A: I'm definitely afraid of surgery, Your Honor. I don't want anything bad that could be worse.

Q: Well, if the pain got even worse than it is now, do you think you'd consider the surgery?

A: I'd have to consider it but I'm very afraid of going under the knife when I've seen so many bad things happen to people that have had the surgery.

(Tr. 40–41.) Based in part on Hartnett's decision not to undergo surgery, the ALJ concluded in his written decision that Hartnett is "not in the extreme degree of discomfort as alleged." (Tr. 18.) According to plaintiff, reassignment is necessary because any future determination by the same ALJ would be based on the "misbegotten notion that the failure to have surgery is *per se* evidence of non-disabling pain." (Pl. Br. at 12.) Because the ALJ's assessment of the severity of plaintiff's pain did not turn solely on plaintiff's decision to forego surgery, I do not subscribe to plaintiff's precise concern. Nonetheless, the ALJ's comments regarding surgery—as well as his impatience and frequent interruptions during the hearing—betray a troubling measure of insensitivity. In addition, I note that this circuit has rejected the notion that a person may not be deemed disabled unless he first accedes to surgery. *See Poole v. Railroad Retirement Bd.*, 905 F.2d 654, 664 (2d Cir.1990) ("[A] person who is totally and permanently disabled but can potentially improve his condition with surgery is [not] required to go the surgical route in order to get benefits.").

---

**6.** Dr. Sharma also found, based on the chronic pain Hartnett experienced, that his prognosis for normal neurological functioning was poor. (Tr. 170.)

The record also reveals several instances—not specifically mentioned by the plaintiff—in which the ALJ has mischaracterized or misunderstood the evidence before him. For example, in determining that Hartnett overstated his pain, the ALJ wrote in his report that Hartnett uses only Motrin. (Tr. 18.) The ALJ thereby disregarded Hartnett's testimony that he also takes the pain killer Cataflam. (Tr. 42–43.) When asked if he goes out to dinner, Hartnett answered "Not really," and said he had not done so for "maybe 6, 8 months, a year." (Tr. 39.) This testimony produced a finding by the ALJ that Hartnett "goes out to dinner on occasion." (Tr. 18.) Similarly, although the record revealed that Hartnett frequently was unable to come to work during his post-accident period of "light duty" for the police department (Tr. 45, 75), the ALJ stated only that Hartnett returned to "working behind a desk" in July of 1993. (Tr. 19). In basing his conclusion that Hartnett can perform sedentary labor on the nominal post-accident work Hartnett performed for the police department, the ALJ appears to have relied upon his own oversimplified version of events.

Another significant example of the ALJ's failure to consider the record with adequate care involves his frequent reference to a single page of Hartnett's "Disability Report" dated March 29, 1995.[7] The ALJ relies heavily on this page for the proposition that Hartnett's "daily life prior to his injury [was] quite similar to his life now." (Tr. 18.) The page in question, entitled "Daily Activities Comparison Sheet," asks a claimant to compare his activities and abilities before and after he became disabled. Even a cursory review of this form and a passing familiarity with the facts of this case reveals that Hartnett misunderstood the question presented. In entry two, Hartnett wrote that while he could perform "light duty only" before becoming disabled, he now "stay[s] home mostly." (Tr. 83.) Obviously, instead of comparing his activities before and after the injury, Hartnett compared his activities before and after the date he was retired from the police department due to his disability. Indeed, on the "before" side of the sheet, Hartnett stated that "I worked light duty only" (Tr. 83), plainly referring to his post-injury, pre-retirement period.[8] Against this backdrop, the Commissioner has wisely agreed to assign the case on remand to a different ALJ.

### CONCLUSION

For the reasons set forth above, the case is remanded to the Commissioner for further proceedings consistent with this memorandum. The Commissioner is further ordered to assign this case to a different ALJ.

So Ordered.

---

**7.** In his written decision, the ALJ refers to this page of the report as "Exhibit 9, page 9." It appears in the certified record at transcript page 83.

**8.** The following exchange at the hearing on July 30, 1996 also demonstrates that the "Daily Activities Comparison Sheet" does not accurately reflect the difference between Hartnett's activities before and after his injury, and that the ALJ had sufficient reason to question the significance of the report:

Q: Do you help [your wife] prepare meals at home?
A: No, I do not.
Q: Do you dishes for her?
A: No, I do not.
Q: Did you do any of that before your accident?
A: Before my accident I was pretty active.
(Tr. 37–38.)