**Robert J. SIMMONS, II, Petitioner,**

v.

**UNITED STATES RAILROAD RETIREMENT BOARD, Respondent.**

**No. 33, Docket 91-4065.**

United States Court of Appeals, Second Circuit.

Argued Sept. 18, 1992.

Decided Dec. 16, 1992.

Daniel J. Kramer, New York City (Daniel S. Gluck, Steven D. Gorelick, Schulte Roth & Zabel, of counsel), for petitioner.

Stanley Jay Shuman, Gen. Atty., Chicago, IL (Catherine C. Cook, Gen. Counsel, Steven A. Bartholow, Deputy Gen. Counsel, Edward S. Hintzke, Asst. Gen. Counsel, Railroad Retirement Bd., of counsel), for respondent.

Before: KEARSE, PRATT and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Robert Simmons seeks to review a decision of the United States Railroad Retirement Board (the "Board") denying his application for a disability annuity under the Railroad Retirement Act, 45 U.S.C. § 231a(a)(1)(v) (1988). The Board based its decision on (1) its determination that Simmons retained the capacity to perform light work, and (2) Simmons's refusal to submit to a psychiatric examination, *see* 45 U.S.C. § 362(n) (1988) (incorporated by reference by 45 U.S.C. § 231f(b)(3) (1988)) (Board may deny benefits if "employee unreasonably refuses to take ... an examination as prescribed by the Board"). Because the Board's finding that Simmons could perform light work is not supported by sub-

stantial evidence, and, since the Board's demand for a psychiatric examination was unreasonable, we now reverse.

## BACKGROUND

Simmons, age 44, worked as a laborer for Amtrak for eleven years. His job regularly required him to move heavy supplies, and, on an average day, he would lift a total of 3,000 pounds. On June 16, 1987, he injured his back while lugging a chest of supplies weighing between 200 and 250 pounds. Thus began Simmons's odyssey through the shoals of the medical profession and administrative bureaucracy.

Since the accident, Simmons has been examined by at least a dozen doctors. First was Dr. Elum, who instructed him to avoid lifting and bending and to lie flat in bed. After a week of bed rest, Simmons returned to Dr. Elum, who advised that he was "[u]nable to work *until* further orders from [an] orthopedist."

Dr. Elum referred Simmons to Drs. Whipple and Jabbur, orthopedic surgeons. They examined Simmons at least nine times between June and October 1987. In August 1987, Dr. Whipple observed that "despite bedrest and non steroidal anti-inflammatories he has had persistent pain in the low back and leg." He diagnosed Simmons as having a "herniated lumbar disc" and concluded that he "may not return to work till further notice." This diagnosis was confirmed by Dr. Jabbur, who, in an examination conducted on October 7, 1987, opined that Simmons "is to be considered disabled and avoid any stresses to the back." He prescribed pain relievers and Simmons began an intensive, five-month regimen of physical therapy.

On October 9, 1987, Simmons underwent his first CAT scan, which showed "central protrusion of the disk posteriorly." Drs. Jabbur and Whipple concluded that the CAT scan "show[ed] bulging of the L5–S1 root centrally as well as laterally" and "some disc herniation," and suggested that Simmons might ultimately need surgery. Accordingly, Dr. Jabbur recommended that Simmons undergo a myelogram, which "is a process not without risk which involves the injection of a radio-opaque substance into the spinal column and, as a consequence, generally is recommended solely in connection with intended surgery." *Poole v. Railroad Retirement Bd.*, 905 F.2d 654, 656 (2d Cir.1990).

Seeking to avoid surgery if possible, Simmons sought a second opinion from Dr. Quinn, also an orthopedic surgeon. Dr. Quinn examined Simmons on November 20, 1987 and took X-rays of his back. Noting that Simmons was still in pain from the injury, and that he "should not be lifting more than 10 [pounds]," Dr. Quinn concluded: "if [Simmons's] symptoms don't resolve [then] he cannot return to what is normal activity for him, and I would elect disc removal. However, disc removal, or continued closed treatment does not guarantee a successful result or successful return to work."

Still in pain, and facing the glum prospect of risky surgery with no assurance of success, Simmons sought additional alternatives with other physicians. He was treated by Drs. Shepard and Yancey in late 1987 and early 1988. They agreed that Simmons had a herniated disc. Dr. Shepard described Simmons as having "persistent severe lower back pain [and] restriction of motion secondary to herniated disc." He counseled against rehabilitation, and referred Simmons to a neurosurgeon, concluding that Simmons had a total disability as a result of the injury and was "unable to work because of pain." Dr. Shepard's diagnosis was confirmed by Dr. Goodwin, who, on January 12, 1988, diagnosed Simmons's condition as "lumbar disc disease, most likely central disc, L5/S1."

Simmons was next examined by two neurosurgeons, Drs. William and Charles Kite. Although the record is unclear, they apparently examined Simmons several times between 1988 and 1989. They ordered a second CAT scan, performed on May 25, 1988, which indicated "[m]oderate centrally protruding disc at L5–S1. Either a focally bulging annulus or focal central disc herniation can appear such as this."

Simmons was then treated by Dr. Zupruk, who concluded that he "ha[d] lumbar muscle spasm and irritation of the left sciatic nerve" and "[a]t the present time, the patient is completely disabled from work." This diagnosis was confirmed when, in a check-up on February 17, 1989, Dr. William Kite observed: "He is going to try and do some light work which I doubt that he will be able to carry out very well. I still think he is disabled for work, myself." Dr. Kite renewed Simmons's prescription for Tylenol 3 (with codeine) to relieve his persistent pain.

On March 17, 1989—almost two years after the accident—Dr. Charles Kite reported:

The patient returns with persistent back pain and leg pain, left worse than right.... His disability is unchanged for work. He is unable to [perform] bending, lifting and can not sit for significant periods of time. Unfortunately there are some medication problems and he would like to try something [different] rather than the codeine. We gave him a prescription for Zorpin, a slow release aspirin agent. We will see if this gives him any relief along with the Robaxin for his muscle spasms. We also discussed utilization [of] swimming for long term basis and control of symptomatology. His disability would be permanent at this juncture barring a significant change in the approach to his problem ie [sic] consideration of a surgical intervention.

By this point in his luckless journey, Simmons had exhausted his employer-provided benefits. And he was still unable to return to work. Accordingly, he filed a *pro se* application for disability benefits with the Board on April 7, 1989, describing his condition as a herniated disc. Three days later, Simmons was interviewed by a "Board Contact Representative" who observed that Simmons had difficulty walking and that he was "unable to sit still due to back pain." The Contact Representative also commented that Simmons was "neat, clean and casually dressed," "well spoken, cooperative and provided all info[rmation] for [the] applications."

A week later, Dr. William Kite reported his findings to the Board in a "Report of Physical Condition" form, noting that Simmons had difficulty walking and continued to have pain in his back and legs. Dr. Kite concluded that "[d]isability is likely to be permanent barring a surgical attack."

The Board referred Simmons to Dr. Tiongson for yet another examination on May 26, 1989. Dr. Tiongson observed that Simmons had difficulty walking, squatting, and dressing, and that he was "[u]nable to lift heavy objects, [and] unable to perform any exertional activity that requires a prolonged ambulation...." Dr. Tiongson diagnosed Simmons with "[c]hronic low back pain L–5–S–1 central disc bulging." Throughout the examination, Simmons was "[c]oherent and cooperative," although he was depressed about losing his job and his resultant financial problems.

It was now over two years since his injury. Simmons had been examined by a phalanx of doctors who had created a virtual library of medical reports. The Board, however, was not satisfied. It instructed a new doctor, Dr. Heller, to review Simmons's file and to complete a so-called "Severity Assessment," which evaluates a claimant's ability to perform certain tasks. Dr. Heller reviewed the paper file but did not actually examine Simmons. He concluded (by checking some boxes on the form) that Simmons could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk six hours in an eight-hour day, push or pull a limited amount, and occasionally climb, bend, stoop and crouch. These observations would indicate that Simmons had a residual functional capacity ("RFC") to perform "light work", as defined by 20 C.F.R. § 220.132(b) (1988).

Based on Dr. Heller's findings, Disability Officer Ahrens and Medical Officer Epstein filed a "Disability Decision Sheet" concluding that Simmons was not totally disabled and, therefore, was not entitled to benefits. Although they noted that Simmons had a "protruding disc" and "considerable loss of motion," they found "no definite herniation." They concluded their brief remarks

with: "Our doctor [presumably Dr. Heller] has given him a light RFC. He is not disabled by Vocational Rule 202.21 [20 C.F.R. § 220 app. 2]."

By letter dated July 25, 1989, the Board's Bureau of Retirement Claims denied Simmons's application for disability benefits because his "condition [was] not severe enough to prevent performance of *any* regular and substantial work." The letter repeated Dr. Heller's findings as to Simmons's RFC for light work, but it did not discuss any of the medical evidence in the administrative record.

Simmons then moved for reconsideration of the Bureau's decision. By letter dated January 9, 1990, reconsideration was denied:

> The medical evidence revealed that you have chronic low back pain and central disc bulging at level L5–S1. There was some residual numbness along the distribution of L5–S1 level. You had limited flexion activity of your lumbar spine. You had difficulty in dressing and undressing and squatting. Your condition is severe but is not disabling for all work. You retain the capacity to perform light work activity.

Simmons disagreed that he could perform light work and appealed to the Board's Bureau of Hearings and Appeals, which assigned his case to Hearing Officer Murphy. Simmons then had several telephone conversations with Board personnel regarding his claim. Contemporaneous notes of these calls indicate that Simmons became belligerent and abusive to Board personnel.

The Bureau of Hearings and Appeals directed Simmons to appear for a psychiatric examination on May 11, 1990 and an orthopedic examination on May 31, 1990, both in Albany. Minutes before his psychiatric exam, Simmons informed the Board that he would not submit to that exam. Simmons, who lived in Rensselaer, also canceled his orthopedic exam several hours before it was scheduled because his arrangements for transportation to the doctor's office in Albany had fallen through. (Simmons, who apparently had lost his home, also had no means of transportation at his disposal.)

The record indicates that Simmons's orthopedic exam may have been rescheduled for June 26, although it is unclear what happened after Simmons missed the May 31 appointment. In any event, on June 15, 1990, the Board's Bureau of Hearings and Appeals denied Simmons's appeal, "find[ing] that [his] refusal to attend the psychiatric examination scheduled for him and his unwillingness or inability to arrange transportation to the orthopedic examination scheduled at close proximity to his home, and his lack of timely notification of same, constitute[d] cause for denying benefits, as prescribed by [45 U.S.C. § 231f(b)(3) ]."

Simmons appealed the decision of the Bureau of Hearings and Appeals to the full Board on July 20, 1990. The Board also required that Simmons be examined by a psychiatrist, in addition to an orthopedist. Simmons requested "a letter justifying [the Board's] request [for a psychiatric exam] and telling me that no one will ever see me going in and out of the shrinks [sic] office and that no one will ever see that report that might embarrass me." The Board responded that the exam was required to process his claim without further explanation.

Simmons did attend an orthopedic exam conducted by Dr. Rogers on December 13, 1990. Rogers sent the Board a two-page letter and a completed medical assessment form. The conclusion to Dr. Rogers's letter provided:

> His diagnosis is lumbar degenerative disc disease. His main restrictions by history would be limited to bending and lifting type of activities. He is desperately in need of weight loss and I would consider his prognosis for significant improvement to be limited. There may be a functional component to his chronic lumbar complaints.

On the medical assessment form, Dr. Rogers indicated that Simmons could: lift or carry fifteen to twenty pounds a maximum of one-third of an eight-hour day; stand or walk a total of five to six hours in an eight-

hour day, but only for one to two hours without interruption; and that he could sit a total of three to four hours in an eight-hour day, but only for one-half to one hour without interruption.

On April 17, 1991, the Board rejected Simmons's appeal, holding:

That orthopedic examination [by Dr. Rogers] and the other evidence in file are consistent with a determination that Mr. Simmons could perform light work. Consequently, Rule 202.20 of the Medical Vocational Guidelines (56 FR 13039, March 28, 1991), requires a conclusion that he is not disabled for all regular employment.

However, Mr. Simmons failed to appear for the psychiatric examination. The Board finds that such an examination is required to determine his entitlement to an annuity under the Act. The Board finds that he has unreasonably refused to undergo such an examination.

Section 12(n) of the Railroad Unemployment Insurance Act (45 U.S.C. § 362(n)) provides that no benefits may be paid if a person unreasonably refused to undergo an examination. Section 12(n) is incorporated into the Railroad Retirement Act by section 7(b)(3) of that Act (45 U.S.C. § 231f(b)(3)). Since Mr. Simmons has unreasonably refused to undergo a needed examination, the Board finds that he is not entitled to a disability annuity under the Act.

Simmons petitioned this court for review of the Board's decision and, on appeal, has been ably represented by counsel *pro bono*.

## DISCUSSION

*The Board's Disability Determination*

■ Our review of the Board's disability determination is the same as our review of disability decisions under the Social Security Act. "Thus we look to whether the Board's determination is supported by substantial evidence on the record as a whole, as we would scrutinize a disability determination made by the Secretary of Health and Human Services under the Social Security Act...." *Poole*, 905 F.2d at 661; *ac*-*cord Harris v. Railroad Retirement Bd.*, 948 F.2d 123, 126 (2d Cir.1991). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ The Board concedes that Simmons has a severe impairment preventing him from performing his past relevant work as a laborer. Accordingly, the Board had the burden of establishing that there was other work that Simmons could perform. *See White v. Secretary of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir.1990); *Rivera v. Schweiker*, 717 F.2d 719, 722–23 (2d Cir.1983). The Board concluded, without elaboration, that the "orthopedic examination [by Dr. Rogers] and the other evidence in file are consistent with a determination that Mr. Simmons could perform light work." The Board describes light work as requiring:

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities.

20 C.F.R. § 220.132(b) (1992).

■ The record, however, belies the Board's perfunctory findings. Since the time he was injured, virtually every doctor who has examined Simmons has concluded either that he is completely disabled or that he is unable to perform the tasks that constitute light work. Drs. Jabbur and Whipple, for example, initially diagnosed Simmons as having a herniated disc that rendered him completely disabled. Although they treated Simmons only from

June to October, 1987, Drs. Jabbur and Whipple examined him on at least nine occasions, prescribed medication for him, ordered and examined a CAT scan, put him on a regimen of physical therapy, and ultimately recommended that Simmons undergo a myelogram procedure with a view toward surgery. They were, therefore, treating physicians and, as such, their views were entitled to *special* deference. *See Harris*, 948 F.2d at 126; *Schisler v. Heckler*, 787 F.2d 76, 85 (2d Cir.1986) [*Schisler I*]; *Ferraris v. Heckler*, 728 F.2d 582, 585 (2d Cir.1984). We reject the Board's argument that Drs. Jabbur and Whipple had not treated Simmons long enough to be considered treating physicians. The *nature*—not the length—of the relationship is controlling. *See Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir.1988) [*Schisler II*] (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir.1983)); *see, e.g., Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir.1990) (applying treating physician rule to doctor who had been treating claimant for three months).

The Board (quite correctly) noted that Drs. Whipple and Jabbur last treated Simmons some eighteen months before he applied for a disability annuity. What the Board did not note, however, is that the doctors who have since examined Simmons support Drs. Whipple's and Jabbur's diagnoses of disability—not the Board's findings. Dr. Quinn, for example, opined that Simmons "should not be lifting more than 10 [pounds]." Drs. Shepard and Zupruk agreed that Simmons was completely disabled. Finally, Drs. William and Charles Kite, who, by the Board doctor's own admission, had followed Simmons "for quite some time," concluded that he was totally and permanently disabled from working. In light of this nearly unanimous view that Simmons is disabled, "it suffices to note that the rule requiring substantial evidence on the record as a whole to support a Board determination counsels that the Board swims upstream in defending a determination contrary to a substantial medical consensus." *Poole*, 905 F.2d at 662.

■ The Board relied principally on the report of Dr. Rogers, a consulting physician who examined Simmons once (without the benefit of either of the two CAT scans). Before analyzing the Rogers report in detail we observe that,

> in evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight. This is justified because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons."

*Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (citations omitted) (quoting *Torres v. Bowen*, 700 F.Supp. 1306, 1312 (S.D.N.Y. 1988)); *see also Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991) ("opinions of 'examining physicians' are entitled to very little weight"); *Thompson v. Secretary of Health & Human Servs.*, 721 F.Supp. 34, 38 (W.D.N.Y.1989) (same).

Dr. Rogers's examination convinced him that Simmons's "clinical condition ha[d] been status quo now for the last year or [two]." As we have already discussed, the "status quo" consisted of documented findings of disability. Nevertheless, Dr. Rogers, who did not even review Simmons's CAT scans, went on to conclude that Simmons was capable of performing certain tasks consistent with an RFC for light work—a conclusion that is at odds with the findings of nearly a dozen doctors who had treated Simmons in the three and one-half years after his accident. We are left without a conviction that, on the record as a whole, Dr. Roger's opinion constitutes substantial evidence. *See, e.g., Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir.1992) ("The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence."); *Smith v. Sullivan*, 776 F.Supp. 107, 111 (E.D.N.Y. 1991) (same).

Although the Board did not explicitly rely on Dr. Heller's findings, Disability Officer Ahrens and Medical Officer Epstein based *their* initial denial of benefits on Dr. Heller's report. In the face of the overwhelming record evidence of disability, however, Dr. Heller's findings are entitled to relatively little weight. Dr. Heller never examined Simmons; he merely reviewed the medical file. Thus, Dr. Heller's findings cannot constitute substantial evidence to overcome a consensus among Simmons's examining doctors—including treating physicians—that he was disabled. *See, e.g., Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir.1987) (testimony of non-examining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"); *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir.1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians").

Even if the Board's findings enjoyed more than scant support in the record, however, its decision would still be deficient because it fails to account for significant, uncontradicted evidence of Simmons's severe pain. It is well settled that "a claimant's subjective evidence of pain ... is entitled to great weight" where, as here, it is supported by objective medical evidence. *Rivera v. Schweiker*, 717 F.2d at 725; *accord Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir.1991); *Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.1987). Almost every doctor who examined Simmons reported that he experienced persistent, severe pain in his back and legs. Since his accident, Simmons has been prescribed Valium, Darvon, Zorpin, and Tylenol 3 (with codeine)—all serious drugs designed to relieve substantial pain. Dr. Shepard concluded that Simmons was "unable to work because of pain." The Board's own doctor and Contact Representative confirmed Simmons's subjective pain, yet the Board ignored it altogether. This error alone would require reversal. *See, e.g., Lambert v. Railroad Retirement Bd.*, 929 F.2d 1197, 1201–02 (7th Cir.1991); *Elam*, 921 F.2d at 1215.

No reading of the record can tease out the conclusion that Simmons's allegations of pain were not credible. His consistent, unchallenged reports of pain were absolutely consistent with the overwhelming weight of objective medical evidence that indicated a severe—and disabling—disc injury. We therefore reverse, as unsupported by substantial evidence, the Board's finding that Simmons was not disabled. *See, e.g., Poole*, 905 F.2d at 663 (reversing denial of disability benefits where both subjective evidence of pain and objective evidence indicated that petitioner was disabled); *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir.1988) (same); *Carter*, 834 F.2d at 65–66 (same).

*The Psychiatric Examination*

█ The Board also maintains that Simmons is not entitled to a disability annuity for a different reason: his refusal to submit to a psychiatric evaluation. The statute, however, authorizes the Board to deny benefits only if an "employee *unreasonably* refuses to take or willfully obstructs an examination prescribed by the Board." 45 U.S.C. § 362(n) (emphasis added) (incorporated by reference by 45 U.S.C. § 231f(b)(3)). We find the *Board's* demand for a psychiatric examination—not Simmons's refusal to submit to it—unreasonable.

The Board did not offer Simmons an explanation, let alone justification, for its command that he go to a psychiatrist. The Board now tells us that Simmons's hostility and belligerence (directed toward Board personnel) justified the request. Even accepting as true the Board's account (to which Simmons has not had an opportunity to respond) of Simmons's behavior, it did not justify the Board's demand for a psychiatric examination. Surely, a claimant's petulance at "the law's delay, the insolence of office" (*Hamlet* act 3, sc. 1), ought not to visit upon him a trip to the psychiatrist's office.

In the five years since Simmons's injury, not a single doctor has even hinted that his symptoms are psychosomatic or that he is suffering from a psychiatric disorder. Nor

has Simmons complained of any such problem. Thus, there is absolutely no nexus between Simmons's application for a disability annuity and the Board's demand that he submit to a psychiatric examination.

We recently recognized, albeit in a different context, that "communications between a patient and a psychotherapist typically involve far more intensely personal information than communications to other kinds of doctors." *United States v. Diamond*, 964 F.2d 1325, 1328 (2d Cir.1992) (recognizing a psychotherapist-patient privilege). Simmons's concerns with the confidentiality of a Board-ordered psychiatric examination were natural because any resulting diagnosis could "be embarrassing to the point of mortification for the patient." *Id.* Without a showing that such an examination was necessary to the Board's determination of Simmons's application, we cannot say that the Board's demand was reasonable and, therefore, that Simmons's refusal to accede to it was unreasonable.

## CONCLUSION

Congress has provided that we may "enter a decree affirming, modifying, or reversing the decision of the Board, with or without remanding the cause for rehearing." 45 U.S.C. § 355(f) (Supp.1990). We are satisfied that reversal is required, and we can discern from the record no good reason to remand for further proceedings. The burden rests upon the Board to show good cause for a remand for further proceedings, and none has been shown. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643–44 (2d Cir.1983); *see, e.g., Rivera v. Sullivan*, 923 F.2d 964, 970 (2d Cir.1991) (reversing and remanding solely for the calculation and allowance of benefits); *Vargas*, 898 F.2d at 296 (same); *Williams*, 859 F.2d at 261 (same); *Murdaugh v. Secretary of Dep't of Health & Human Servs.*, 837 F.2d 99, 102 (2d Cir. 1988) (same).

Simmons has not worked for over five and one-half years since he injured his back. He apparently has exhausted his health benefits and has lost his home. Be-

cause "remand would merely delay the receipt of benefits to which [Simmons] is entitled, reversal is appropriate." *Thompson*, 957 F.2d at 614; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose"); *Gavin v. Heckler*, 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). Accordingly, we reverse and remand the case to the Board solely for the purpose of calculating benefits.