Hector O. **MOLINA, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 3:98CV860 (GLG).**

United States District Court, D. Connecticut.

March 16, 1999.

---

Richard W. Gifford, Wethersfield, CT, for Plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## *OPINION*

GOETTEL, District Judge.

This appeal is brought under 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security that denied the application of plaintiff, Hector O. Molina, for a period of disability and disability insurance benefits under the Social Security Act. Pursuant to Rule 12(c), Fed.R.Civ.P., plaintiff has moved for judgment on the pleadings [**Doc. # 5**], asking us to reverse the decision of the Commissioner. Defendant has moved for an order affirming the final decision of the Commissioner [**Doc. # 7**]. For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence and, thus, affirms that decision.

## *BACKGROUND*

### *Administrative Proceedings*

This appeal concerns plaintiff's March 1994 application for a period of disability and disability insurance benefits, in which he alleges an inability to work since July 21, 1993, due to back and neck problems, bursitis in both shoulders, diabetes mellitus, a hernia, and hypertension. (R. 84–86). His application for benefits was initially denied by the Social Security Administration (R. 96–99), and was denied again upon reconsideration. (R. 104–07). Plaintiff then requested a hearing before an administrative law judge ("ALJ") (R. 108), which was held on February 23, 1996. Plaintiff was represented by counsel and testified at the hearing. Additionally, a vocational expert testified. By decision dated September 14, 1996, (R. 12–24), the ALJ determined that plaintiff was not disabled in that his impairments did not prevent him from performing his past rele-

vant work. (R. 24). Plaintiff's counsel requested reconsideration of this decision by the Appeals Council (R. 7–8), which considered the arguments raised by counsel in his letter brief dated October 6, 1996. (R. 268–71). On March 25, 1998, the Appeals Council declined plaintiff's request for review (R. 4–6), thus rendering the ALJ's determination the final decision of the Commissioner and subject to judicial review. On May 8, 1998, plaintiff filed the instant action appealing the final administrative decision denying his claim.

### Facts

Plaintiff was born on August 12, 1939, in Puerto Rico. He was 53 years of age at the time he allegedly became disabled in July, 1993. Plaintiff has a General Equivalency Diploma and reads, writes, and speaks English, although from his testimony English appears to be his second language. For twenty years, plaintiff worked as a solderer of silver hollowware, such as trays, coffeepots, teapots, and sugar bowls. His job involved mostly sitting and sometimes a couple of hours of standing during an eight-hour day. (R. 42). His soldering job involved frequent reaching and lifting up to ten pounds. (R. 43). Plaintiff testified that, although he could not do soldering work while standing, when his back started to hurt and he needed a break, he could stand and do some grinding or other work that required standing. (R. 49). He also said his job required him to bend to put finished parts in a box that was located next to him, but the job did not require him to kneel. (R. 71). In 1991, his employer went bankrupt and plaintiff was laid off.

In March, 1992, while unemployed, plaintiff was involved in an automobile accident in which he injured his lower back, which exacerbated his back problems from an accident 25 years before. (R. 56). In the summer of 1993, he worked at a temporary job assembling fuel pumps. This job involved a lot of reaching and more standing than his soldering job. It also required him to lift up to twenty pounds. Plaintiff testified that he would sit for three or four hours and then would have to stand for the remaining five or four hours. (R. 44). After two months, plaintiff was about to quit because of back pain, but he was laid off instead. (R. 40).

At the hearing before the ALJ in February, 1996, plaintiff testified that he did not feel that he could perform his former job of solderer because of the arthritis in his back, the bursitis in his shoulder, his diabetes, and problems with his eyesight. (R. 50–51). Plaintiff testified that he could sit or stand for two hours at a time without feeling pain. He could walk about a quarter of a mile, and he could lift ten pounds frequently. However, he could not do repetitive bending. (R. 76–77). Plaintiff also testified that he has constant pain in his lower back that he described as "like a toothache." (R. 65, 67). He has numbness, a vague prickly feeling, in his right leg. (R. 65–66). His shoulder and elbow pain "comes and goes" but is not "that strong" if he does not do too much activity. (R. 67). Plaintiff also testified that he has diabetes and high blood pressure (R. 57), which cause him to experience dizziness and blurred vision in the morning from low blood sugar if he has not eaten. (R. 51). Although plaintiff testified that his visual acuity was not what it used to be and that he had recently been diagnosed with cataracts, there were no ophthalmology records or other medical reports introduced to substantiate this claim. Plaintiff testified that he was taking Micronase (an oral hypoglycemic drug)[1] for his diabetes, Accupril for blood pressure control, and Oruvail (an anti-inflammatory)[2] for back pain. (R. 64–65).

As for his daily activities, plaintiff stated that he sometimes has trouble dressing himself. (R. 59). He used to go to the

---

**1.** *Physician's Desk Reference* 2623 (50th ed.1996).

**2.** *Id.*

grocery store but, because he has trouble standing for long periods, he now drives his wife to the store and waits for her in the car. (R. 61). His typical day consists of watching television, sometimes watching his six-month-old grandson (which at times requires him to pick up the baby), and occasionally visiting friends. (R. 62–63). He has no trouble using the stairs in his house. (R. 38). Plaintiff testified that, approximately three times a day, he has to lie down when he gets tired of sitting. (R. 64).

The Vocational Expert who testified at the hearing described plaintiff's past work as a solderer as unskilled and sedentary. He described his assembly work as having a light range of exertion. (R. 75, 80). The ALJ posed three hypothetical questions to the Vocational Expert. First, assuming an individual was able to sit or stand for six hours out of an eight-hour workday with reasonable breaks, and was able to lift ten pounds frequently and twenty pounds occasionally, but was able to bend only occasionally due to pain, and assuming the person was of plaintiff's age, education, and past relevant work experience, could that person return to either of plaintiff's past jobs? The Vocational Expert testified that individual could return to either of plaintiff's past jobs. (R. 78). He further testified that, assuming that person had also developed cataracts such that he lacked the visual acuity to manipulate fine objects, that person could not return to plaintiff's past work but there would be other sedentary work he could perform. (R. 78). Finally, assuming that individual had bursitis and elbow soreness to the extent he could not perform reaching (but disregarding the vision problems), the Vocational Expert testified that individual could not perform plaintiff's relevant past work. (R. 79).

**3.** Spinal stenosis is the narrowing of the space around the spinal cord. *The Merck Manual of Medical Information* 328 (Home Ed.1997).

## Plaintiff's Medical Treatment

Beginning in 1989, plaintiff's primary treating physician was Dr. Carl Kellan, an internist, whom plaintiff saw approximately once a month for his diabetic condition, which was controlled with oral medication, and for high blood pressure, also controlled by oral medication. Plaintiff was not insulin dependent. The first mention of any back problems appears in March of 1992, following plaintiff's automobile accident. (R. 136–163).

Plaintiff had been examined at the Emergency Room at the Veterans Memorial Medical Center in Meriden, Connecticut. (R. 165). A CT Scan was performed which showed no abnormalities from the accident (R. 168), although it did reveal the preexisting conditions of bulging at the L3–L4 disc space, an absence of disc space at L4–L5, severe stenosis of the foramina and lateral recesses as well as spinal stenosis,[3] and partial sacralization[4] of L5. (R. 151). Plaintiff was released that day into the care of Dr. Kellan, who diagnosed back and neck sprain/strain and sciatica. Dr. Kellan referred plaintiff to William L. Woods, R.P.T., for physical therapy. On April 2, 1992, Dr. Kellan notes "No disability."

For four months, plaintiff went to physical therapy to reduce his back pain and spasm and to increase his strength and range of motion. Plaintiff's last visit to Dr. Woods was on July 14, 1992, at which time Dr. Woods notes that plaintiff has made excellent progress and that all of his goals have been met. (R. 206).

During this four-month period, Dr. Kellan's records indicate that plaintiff was complaining of back pain, and on June 8, 1992, Dr. Kellan referred plaintiff to Dr. James K. Sabshin, a neurologist. Dr. Sabshin saw plaintiff in July. He reports that

**4.** "Sacralization" is defined as the anomalous fusion of the fifth lumbar vertebra to the first segment of the sacrum, so that the sacrum consists of six segments. *Dorland's Illustrated Medical Dictionary* 1373 (25th ed.1974).

plaintiff was "in his usual state of health" until March, 1992, when he was involved in a rear-end collision. Plaintiff had the acute onset of low back pain with continuing spasm and difficulties in terms of range of motion. He was treated with appropriate conservative measures under the direction of Dr. Kellan, including physical therapy, which gave him some relief. Dr. Sabshin also noted that plaintiff had been involved in another automobile accident 25 years ago. Plaintiff was also taught basic posture and exercises, which he continued to perform. (R. 181). Plaintiff had a past history of diabetes. His only relevant current medication was motrin which he took occasionally for pain. Dr. Sabshin reviewed the radiology report from the Veterans Memorial Medical Center, discussed above. (R. 182). His assessment of plaintiff was that he continued to suffer from his injury in March and that further physical therapy would not benefit him. Dr. Sabshin did not recommend surgical intervention. (R. 182–83). Dr. Sabshin concludes:

> I doubt that he will be able to return *to any type of work at this time*, given his continuing problems *which would involve lifting more than 20 pounds, or involve frequent bending, stooping, squatting, or heavy labor*. I would estimate his permanent partial disability as a result of this injury at approximately ten percent (10%).

(R. 183) (emphasis added). He was of the opinion that plaintiff had reached maximum medical improvement.[5] Plaintiff saw Dr. Sabshin on only one occasion. Moreover, Dr. Sabshin was the only specialist who evaluated plaintiff.

On August 24, 1992, Dr. Kellan's records indicate "?Disability!" and further note "Disability 10% (Dr. Sabshin)." (R. 139). On September 25, 1992, Dr. Kellan wrote plaintiff's attorney that he concurred with

Dr. Sabshin's assessment of a permanent partial disability of 10% as a direct result of the automobile accident on March 16, 1992. (R. 187).

Over the next two years, Dr. Kellan's records contain a number of references to plaintiff's complaints of lower back pain, sometimes getting better, sometimes worse, and sometimes better and worse, although some monthly reports contain no reference at all to plaintiff's back.

An X-ray of the lumbar spine on March 4, 1994, showed severe degenerative changes and marked narrowing at L4–L5 and L5–S1. (R. 163).

In the Disability Report filed by plaintiff in April, 1994, plaintiff states that he cannot sit for long periods; walking for long periods is restricted; his back often stiffens; bending is very limited; he cannot lift heavy objects; he has trouble getting out of bed in the morning; and he often experiences high blood pressure. (R. 113). Plaintiff describes his ability to do household chores as very limited because of his back. Plaintiff states "chores like raking leaves makes [sic] my back stiffen up after 15–20 minutes." (R. 116).

A Disability Determination Examination was performed by Dr. Thomas F. McLoughlin on June 28, 1994, whose assessment was:

1. Osteoarthritis of L/S spine aggravated by automobile accident (1992)

2. Hypertension (Under Poor control)

3. Adult Onset of Diabetes Mellitis

(R. 216–18). He describes plaintiff's chief complaint as back problems, which become worse when plaintiff stays in one position for any length of time. Dr. McLoughlin reports that plaintiff had been on medication for his back as well as for his high blood pressure and Micronase for his dia-

---

5. This same letter appears in the record with a signature block for Dr. Isaac Goodrich, who is in the same practice with Dr. Sabshin, although the letter is not signed. (R.184–86). There is nothing in the record to indicate that Dr. Goodrich ever saw or treated plaintiff, and plaintiff has not listed Dr. Goodrich in his Disability Report filed in April 1994. (R. 133–16). Accordingly, this Court will disregard this letter from Dr. Goodrich.

betes for five years. (R. 216). His examination of plaintiff's back revealed that "[e]xtension of 30% caused pain. Flexion from the lying position, stiff. Straight leg raising equal bilaterally to 90%. Movements good in general. No scoliosis." (R. 218). He reports that plaintiff exhibited full range of motion of his extremities and equal strength in the upper extremities. His gait was normal. (R. 218).

At the hearing before the ALJ, plaintiff's counsel was given the opportunity to submit additional medical evidence. (R. 68). Additional records from Dr. Kellan were submitted, although these are virtually illegible. (R. 240–258). Plaintiff's attorney also provided a follow-up report from Dr. Kellan dated May 31, 1996, on plaintiff's disability status. Dr. Kellan reiterated Dr. Sabshin's opinions *from 1992.* He further stated:

> Mr. Molina was [sic] previously documented that he may not be able to perform duties as a solderer/assembler 1992. He did not work from 10/91—6/93 due to injuries. However he did work [sic] find work and attempted to work ⅔ and ⅔, after that period of time it became apparent that he couldn't do the job. It is purely co-incidental that the layoff took place at the same time.

> It is also my opinion that this patient has disabilities which keep him from being employable as a solderer/assembler.

Following the hearing, a consultative examination was performed by Dr. Micha Abeles, an internist, on May 3, 1996, who again describes plaintiff's major problem as back pain, which goes back 24 years, but which did not interfere with his ability to work until the automobile accident in March, 1992. Plaintiff complained that his back pain had worsened and that he found it difficult to get out of bed in the morning and had to take a hot shower as soon as he gets up. (R. 259). Plaintiff related to Dr. Abeles that he could not sit for more than one-half hour and could not stand for more than one hour. Bending did not bother him, but he could not perform repetitive bending. Plaintiff told Dr. Abeles that there was nothing wrong with his upper extremities but that he found it difficult to perform reaching. In addition to low back problems, he complained of pain in the right thigh up to the knee. (R. 260). Dr. Abeles also noted a history of hypertension for seven to eight years for which plaintiff was taking Accupril, and diabetes of the same duration for which plaintiff was taking Micronase. Plaintiff claimed that his diabetes had caused him to develop cataracts. Plaintiff did not, however, report any problems with dizziness or blurred vision. No diabetic neuropathy [6] was observed, and there was no nephropathy [7] or vascular involvement reported by plaintiff. Plaintiff was also taking Oruvail for his low back problems. (R. 260).

Dr. Abeles' physical examination of plaintiff indicated that his shoulders and elbows were normal, although he noted a past history of bursitis. His lower extremity examination showed normal hip, knee, and ankle motion, and the neurological examination was normal. Dr. Abeles reports that "back motion indicated flexion to 70 degrees with discomfort. Extension was normal with minimal discomfort. Lateral motion was normal. Ankle and knee reflexes were 1+ and equal." (R. 261). He also reviewed plaintiff's x-rays and CT scan.

Dr. Abeles completed Form HA–667, Medical Assessment of Ability to do Work–Related Activities (Physical). (R. 263–64). Dr. Abeles states that plaintiff

---

6. Diabetic neuropathy refers to nerve damage that may result as a long-term complication from diabetes. This can result in sudden or gradual weakness of a leg, reduced sensations, tingling, pain in the hands and feet, or chronic nerve damage. *The Merck Manual of Medical Information* 719–20 (Home Ed.1997).

7. This refers to kidney damage that may result as a long-term complication of diabetes. *Id.*

could sit for short periods of one-half to one hour before needing to move, *i.e.* walk or lie down for brief periods, and he could then resume sitting. Dr. Abeles states that plaintiff should not perform lifting as part of his work. Plaintiff should only lift a maximum of 5 to 10 pounds on occasion, and he should carry only occasionally a minimum amount of weight, *i.e.* 5 pounds. (R. 263). Plaintiff's standing should be limited to one-half to one hour, before plaintiff would require a change to sitting or lying down, and he could then resume standing. Plaintiff's walking was limited to one-half hour and bending to occasionally only. (R. 263–64). Dr. Abeles stated that plaintiff had no problem handling objects but should not push or pull. His seeing, hearing, and speaking were evaluated as normal. (R. 264).

### DISCUSSION

The Social Security Act defines "disability" as the:

> ... inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ....

42 U.S.C. §§ 416(i)(1), 423(d)(1). The Act further provides, in relevant part, that:

> (2)(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ...

42 U.S.C. § 423(d)(2)(A).

The parties agree that plaintiff has not engaged in substantial gainful employment since his alleged onset date of disability of July 21, 1993; that plaintiff has severe degenerative disc disease; and that plaintiff does not have an impairment of "listing" level.[8] The parties obviously disagree on the correctness of the ALJ's finding that plaintiff retains the residual functional capacity to perform his past relevant work as a solderer or mechanics assembler and, thus, is not disabled. It is plaintiff's burden to demonstrate that he is precluded from performing the physical demands of his past relevant work. *Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir.1995).

The ALJ found that plaintiff had severe musculoskeletal impairments which restrict him to light work with minimal bending and a "sit-stand" option. Based on the Vocational Expert's testimony, the ALJ concluded that plaintiff's past two relevant occupations as a mechanical assembler and a solderer were consistent with his exertional limitations. Accordingly, at the fourth sequential step in the determination of whether plaintiff was disabled,[9] the ALJ

---

8. This refers to the Listing of Impairments in Appendix 1 of Subpart P, 20 C.F.R., Pt. 404, which describes specific disabilities that are so severe that a claimant suffering from a listed impairment will be conclusively presumed to be unable to engage in any substantial gainful activity. *See Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

9. The Regulations set forth a five-step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Social Security Act:

1. Is the claimant currently engaged in "substantial gainful activity?" If not, the second issue is considered.
2. Does the claimant have a "severe impairment" that limits his physical or mental ability to do basic work activities? If so, the third inquiry is considered.
3. Is the severe impairment a "listed impairment"? (*See* Note 8 *supra*). If so, the claimant is considered disabled without consideration of vocational factors such as age, education, and work experience. If not, the fourth issue is considered.
4. Does the severe impairment prevent the claimant from performing his past rele-

found that plaintiff was not disabled within the meaning of the Social Security Act. (R. 13).

■ We review the Commissioner's decision that plaintiff is not disabled to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Shalala,* 59 F.3d at 314. "Substantial evidence" is less than a preponderance, but more than a mere scintilla. It has been quantified as such evidence as a "reasonable mind might accept as adequate to support a conclusion." *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). Under this standard, absent an error of law, this Court will uphold the Commissioner's decision if it is supported by substantial evidence even if this Court might have ruled differently were we to have made the initial decision. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *see generally* Hon. Thomas P. Smith & Patrick M. Fahey, *Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court,* 14 Quinnipiac L.Rev. 243, 249 (Summer 1994).

Plaintiff argues that the Commissioner's decision is contrary to law and not supported by substantial evidence for the seven reasons discussed below.

1. *The ALJ erred by disregarding the conclusions of plaintiff's two treating physicians and the consultative physician and substituting his own opinion concerning plaintiff's disability and restrictions.*

Plaintiff asserts that the ALJ disregarded the findings of plaintiff's treating doctors, Dr. Kellan and Dr. Sabshin, concerning plaintiff's limitations of back extension and flexion, which were supported by the x-rays and CT scans, and their 10% disability ratings, as well as the physical assessment performed by Dr. Abeles.

■ First, Dr. Sabshin was not a "treating physician" as that term is defined by the Regulations, which draw a distinction between consultative examinations, such as that performed by Dr. Sabshin, and a treating relationship. *See* 20 C.F.R. § 404.1527(d)(2). Thus, his opinion was not entitled to the controlling weight that should generally be given that of treating physicians. *See Id.; Rosa v. Callahan,* 168 F.3d 72, 77–78 (2d Cir.1999). The ALJ did give weight to Dr. Sabshin's 10% permanent partial disability rating, which was supported by the CT scan and x-rays, but found "somewhat gratuitous[ ]" the doctor's statement that "I doubt that he will be able to return to *any type of work at this time,* given his continuing problems which would involve lifting more than 20 pounds...." (R. 17) (emphasis added). This conclusion not only invaded the province of the ALJ, *see* 20 C.F.R. § 404.1527(e), but also overlooked the fact that there are many jobs, including plaintiff's past employment as solderer, that do not involve lifting over 20 pounds. It was also made six months prior to the claimed onset date of disability and did not explain plaintiff's alleged disability in 1996 at the time of the hearing, four years later. (R. 17). The Court finds that the proper weight was afforded Dr. Sabshin's opinion.

■ The ALJ correctly afforded "extra weight" to Dr. Kellan's opinion, who was plaintiff's long-time "treating physician." [10]

---

vant employment? If not, the claimant is not disabled. If so, the fifth issue is considered. The claimant has the burden of proof on the first four issues. The burden shifts to the Commissioner on the fifth issue.

5. Considering the claimant's age, education, and work experience, is there alternative "substantial gainful activity" that the claimant can perform? If so, he is not disabled. If not, he is disabled within the meaning of the Act.

20 C.F.R. § 404.1520(a)-(f); *see Rosa v. Callahan,* 168 F.3d 72, at 77(2d Cir.1999); *see generally* Hon. Thomas P. Smith & Patrick M. Fahey, *Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court,* 14 Quinnipiac L.Rev. 243, 246–47 (Summer 1994).

**10.** The Regulations provide:

See Diaz v. Shalala, 59 F.3d at 313 (discussing the "treating physician rule"). The ALJ, however, did not accept Dr. Kellan's opinion that plaintiff was not employable as a "solderer/assembler." (R. 17). Although plaintiff had a long relationship with Dr. Kellan, Dr. Kellan's treatment of plaintiff pertained primarily to his diabetes and hypertension. Dr. Kellan's 1992 and 1996 letters simply concurred with Dr. Sabshin's *1992* opinion, even though four years had passed since plaintiff saw Dr. Sabshin. Dr. Kellan's 1996 letter provided no new medical information or diagnoses and offered only a general opinion that plaintiff was not employable in his past work. The ALJ correctly noted that the letter was factually inaccurate as to the dates of plaintiff's injury, and failed to indicate any current conditions that would prevent plaintiff from performing his former job as a solderer. (R. 15).

> ... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed below, as well as the factors in paragraphs (d)(3) through (5) of this section in determining the weight to give the opinion....

20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). Factors that will be considered in determining the amount of weight to be given the opinion of a treating physician are: the length of the treatment relationship and the frequency of examination, 20 C.F.R. § 404.1527(d)(2)(i); and the nature and extent of the treatment relationship, 20 C.F.R. § 404.1527(d)(2)(ii).

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.... When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

As set forth in the Regulations, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(e). Moreover, Dr. Kellan's opinion that plaintiff was not employable was not consistent with other substantial evidence in the case.[11] See 20 C.F.R. § 404.1527(d)(2); *Schisler*, 3 F.3d at 567. Plaintiff himself testified at the hearing that he could sit or stand for two hours at a time; that he could walk a quarter of a mile; that he could lift ten pounds frequently; and that he could bend but could not perform frequent bending. Based on this testimony and plaintiff's description of his former jobs, the Vocational Expert found this consistent with the requirements of his former sedentary jobs[12] as a solderer and assembler.

> *Id.* When controlling weight is not given to the treating source's medical opinion, factors to be applied are supportability (the degree to which the source presents relevant medical evidence to support his or her opinion), 20 C.F.R. § 404.1527(d)(3); consistency with the record as a whole, 20 C.F.R. § 404.1527(d)(4); and specialization, 20 C.F.R. § 404.1527(d)(5).

**11.** In *Rosa v. Callahan*, 168 F.3d 72, 78–79, the Second Circuit reaffirmed its earlier holding that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. In this case, the ALJ did ask plaintiff's counsel to provide additional records. Plaintiff's counsel provided additional records from Dr. Kellan as well as his 1996 letter, discussed above.

**12.** "Sedentary work" is the least rigorous of the five categories of work classified by the Regulations for purposes of determining the physical exertion requirements of work in the national economy (for purposes of the fifth step in determining whether a claimant is disabled). Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other

We find that the ALJ did not err in rejecting Dr. Kellan's conclusory opinion that plaintiff was not employable, since his statement in this regard was not a medical opinion, it was not well supported by medical findings, and it was not consistent with other evidence in the record. *See* 20 C.F.R. § 404.1527(d).

Plaintiff further argues that the ALJ improperly disregarded Dr. Abeles' report, which limited plaintiff to sitting and standing for one-half to one hour before plaintiff would need to move by walking or lying down for a brief period after which plaintiff could then resume sitting or standing. Dr. Abeles also limited plaintiff's lifting to five to ten pounds and carrying to five pounds. The ALJ adopted the "sit-stand" suggestion of Dr. Abeles but rejected the stricter lifting and carrying limitations, which were contrary to plaintiff's own testimony of his physical abilities at the hearing just a few months before he saw Dr. Abeles. Dr. Abeles' work restrictions were also more stringent than those suggested by any other doctor who saw plaintiff, despite the fact that there was no medical evidence to suggest that plaintiff's condition had deteriorated to the degree that these stricter limitations were necessary.

We find that there was substantial evidence in the record to support the ALJ's findings and that the ALJ did not err in the weight that he afforded to the opinions of Drs. Kellan, Sabshin, and Abeles.

### 2. The ALJ committed error in his findings as to plaintiff's credibility.

■ Plaintiff next claims that the ALJ committed error when he found that plaintiff's "alleged physical limitations are *partially* credible. Restrictions from performing more than light exertion, and a sit-stand option, are consistent in all the reports." (R. 18). Plaintiff maintains that

sedentary criteria are met. 20 C.F.R. § 404.1567(a); *Rosa v. Callahan,* 168 F.3d 72, 78, n. 3.

the second sentence is simply not true because all of the treating physicians, Drs. Sabshin, Goodrich,[13] and Kellan, state that plaintiff is disabled and Dr. Abeles, the consultative physician, indicate a residual functional capacity of less than sedentary.

Although Drs. Sabshin and Kellan did give plaintiff a 10% permanent partial disability rating, that is not the same as a finding that plaintiff is "disabled" under the Social Security Act. As noted above, plaintiff testified to physical limitations concerning sitting, standing, lifting, walking and bending that were fully consistent with those expressed by Drs. Sabshin, Kellan, and McLoughlin, but inconsistent with the conclusion of Drs. Sabshin and Kellan that he was not employable. Their opinion in that regard is simply not supported by the medical evidence or plaintiff's own testimony concerning his physical capabilities. Moreover, Dr. Sabshin's opinion was rendered months prior to plaintiff's alleged onset date, indicating that plaintiff did not consider himself disabled at that time.

In terms of the ALJ's assessment that plaintiff was only partially credible, there is ample support for this conclusion in the record. For example, plaintiff claimed to have bursitis, but there are no medical records whatsoever to support these complaints. Dr. McLoughlin observed a full range of motion in plaintiff's upper extremities and equal strength in both upper extremities. Dr. Abeles' examination of plaintiff showed no abnormality of the shoulders or elbows suggestive of bursitis or similar condition. He states: "On this examination, there was normal abduction, normal external and internal rotation. His elbows could be fully extended without pain." There was also no medical support for plaintiff's complaints of blurred vision. Dr. Abeles noted no problem with dizziness, and normal vision. Thus, the ALJ's statement that plaintiff was partially credi-

**13.** There is no evidence in the record that plaintiff was ever examined or treated by Dr. Goodrich. *See* Note 5, *supra.*

ble is fully consistent with the medical records as a whole.

### 3. The ALJ failed to consider the pain felt by Plaintiff from his obliterated lumbar disc and spinal stenosis.

 Plaintiff argues that the ALJ did not consider plaintiff's subjective complaints of back pain, which is a non-exertional impairment that must be evaluated under the "pain standard" set forth in the regulations, 20 C.F.R. § 404.1529.[14] In cases where the medical evidence supports the claimant's complaints, they should be given "great weight." *Simmons v. United States Retirement Board,* 982 F.2d 49, 53 (2d Cir.1992).

 Contrary to plaintiff's suggestions, the ALJ adopted and applied the multi-factor analysis of 20 C.F.R. § 404.1529 to evaluate plaintiff's symptoms including his complaints of pain. (R. 13–15). The ALJ considered plaintiff's subjective complaints in the Disability Report, as well as his accounts of his daily activities, the medications he was taking for pain, his testimony at the hearing concerning his pain, and his subjective exertional limitations. Later in the decision, the ALJ noted that his finding that plaintiff could perform light work with a sit-stand option and no frequent bending "was not meant to minimize the lumbar pain reported by [plaintiff]. He has a severe lumbar impairment ... but one which does not preclude all substantial gainful activity." (R. 19). It was not inconsistent for the ALJ to find that, although plaintiff suffered from pain, he was not so severely impaired as to meet the test for disability under the Social Security Act. "[D]isability requires more than the inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983). We find no error in the weight afforded plaintiff's subjective complaints of pain by the ALJ.

### 4. The ALJ erred in having the Vocational Expert determine if plaintiff were capable of performing his past relevant work.

Plaintiff asserts that not only was it properly within the province of his doctors, and particularly plaintiff's treating physicians, to make a determination as to

---

**14.** The Regulations provide generally:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.... However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medial impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.
20 C.F.R. § 404.1529(a). The Regulations further require the ALJ to consider the following factors as relevant to the claimant's symptoms, including pain:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.
20 C.F.R. § 404.1529(3); *see* (R. 14).

whether plaintiff could perform his past relevant work but it was improper for the Vocational Expert to make this determination.

■■■■■ The Regulations specifically provide that the determination of whether a claimant is disabled is a determination to be made by the ALJ. *See* 20 C.F.R. § 404.1527(e). The ALJ is not bound by a doctor's statement that a claimant is disabled. *Id.; Parker v. Callahan,* 31 F.Supp.2d 74, 77 (D.Conn.1998). Moreover, in making this determination, the ALJ may properly rely on the testimony of a vocational expert. *See Todd v. Callahan,* 131 F.3d 132 (2d Cir.1997) (published opinion).

In this case, the ALJ posed three hypothetical situations to the Vocational Expert, only the first of which was supported by the medical evidence in the record as a whole. (The other two hypotheticals included complaints of plaintiff, *i.e.* lack of visual acuity and bursitis, for which there was no support in the medical records). The first question posed was:

I'd like you to assume an individual who is capable of lifting 10 pounds frequently and 20 pounds occasionally, ... who can sit for 6 hours a day and stand for 6 hours a day with a sit/stand option......

... that [the individual] can sit 6 hours over the course of an 8 hour day with ... reasonable breaks and ... can stand for 6 hours over the course of the day with breaks ...

. . .

And [the individual] can rotate between the two. What I'm saying is a sit/stand option. At [the individual's] option [he] can sit up, stand. [He] can either sit or stand rotating between the two at [his] option.

. . .

But that such an individual is limited by pain so he can only bend very occasionally. He cannot bend frequently. Okay, with that hypothetical and assume this claimant's age, education, and past relevant work. Could such an individual return to any of his past relevant work? (R. 77–78). There was record evidence to support this first hypothetical question, which we hold fairly and accurately described plaintiff's residual functional capacity.

### 5. The ALJ's findings regarding plaintiff's sit/stand restrictions require a finding that he is disabled.

■■■ Plaintiff next argues that the ALJ's conclusion that plaintiff was restricted to "light work with a sit/stand option and no frequent bending" was incompatible with sedentary benchwork involved in plaintiff's former solderer job and required a finding that he was disabled.

Plaintiff testified that his former job as a solderer involved mostly sitting and sometimes a couple of hours of standing during an eight-hour day (R. 42) and that, when he needed a break from sitting, he could stand and do some grinding work or other job that could be performed while he was standing. (R. 49). The only bending required by plaintiff's job to which he testified was placing completed pieces in the box located next to him. (R. 71).

Plaintiff also testified at the hearing that he could sit or stand for two hours at a time without feeling pain. (R. 76–77). He could bend but not perform repetitive bending. (R. 76–77). His testimony in this regard was consistent with the restrictions found by Dr. McLoughlin, Dr. Kellan, and Dr. Sabshin. The ALJ's findings that plaintiff could perform his former soldering job was supported by substantial evidence in the record.

### 6. The Vocational Expert was given an incomplete hypothetical.

Plaintiff also asserts that error was committed by the ALJ in the hypothetical that he posed to the Vocational Expert because his question did not include the restric-

tions contained in Dr. Abeles' consultative report (although plaintiff recognizes the impossibility of his, since Dr. Abeles examined him *after* the ALJ hearing) nor did the hypotheticals include his subjective complaints of pain. Finally, plaintiff argues that, when the hypothetical included the fact that the claimant suffered from bursitis, the Vocational Expert responded that the claimant could not perform his past relevant work, and that the ALJ should have relied on this opinion.

We have already addressed the proper weight to be given the physical restrictions of Dr. Abeles, which were based largely on plaintiff's own subjective complaints to Dr. Abeles, and inconsistent with those of every other treating doctor. *See* Discussion at page 19, *supra.* As to the ALJ's failure to rely on the Vocational Expert's response to the hypothetical that assumed plaintiff had bursitis, as discussed above, there is no medical evidence to support plaintiff's claim at the hearing that he had active bursitis. (Presumably, the ALJ posed this hypothetical to the Vocational Expert in the event that plaintiff's complaints were subsequently substantiated by Dr. Abeles, since, as he noted, there was no other evidence in the record to support this complaint). *See* Discussion at page 21, *supra.*

7. *The ALJ erred in considering the residual functional capacity needed to perform plaintiff's past relevant work.*

Last, plaintiff argues that, although the ALJ found that plaintiff had the residual functional capacity to perform light work with no frequent bending, he incorrectly concluded that plaintiff could perform his past relevant work, despite plaintiff's testimony that his work as a solderer involved frequent bending. Thus, plaintiff asserts that his former job was beyond the residual functional capacity found by the ALJ. Plaintiff relies primarily on his response to his counsel's question that he had to bend to put finished items in a box which was located next to him. (R. 71). As dis-

cussed above, plaintiff's description of his job duties as a solderer fit within the limitations posed by the ALJ. There was no error in this regard.

### CONCLUSION

There being substantial evidence in the record to support the Commissioner's decision that plaintiff was not disabled within the meaning of the Social Security Act, the decision of the Commissioner is AFFIRMED. Accordingly, plaintiff's Motion for Judgment on the Pleadings [**Doc. # 5**] is DENIED and defendant's Motion for Order Affirming the Commissioner's Decision [**Doc. # 7**] is GRANTED.